Rule 23 order filed
April 15, 2010;
Motion to publish granted
April 30, 2010.

NO. 5-09-0416

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| LARRY DOBBS, FRANCES DOBBS, WAYNE RICHARD, and LORENA RICHARD, | ) Appeal from the ) Circuit Court of ) Jefferson County. |
| Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) No. 07-MR-86 |
| | ) |
| DONALD WIGGINS, | ) Honorable ) Mark R. Stanley, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

JUSTICE STEWART delivered the opinion of the court:

The plaintiffs–Larry Dobbs, Frances Dobbs, Wayne Richard, and Lorena Richard–filed a complaint against their neighbor, Donald Wiggins, to enjoin a private nuisance caused by numerous dogs kenneled on Wiggins's property. On July 21, 2009, the circuit court of Jefferson County, Illinois, entered a judgment against Wiggins that ordered him to decrease the number of dogs in his possession to no more than six and to take all the steps necessary to adequately suppress any noise caused by any barking dogs. Wiggins filed a timely notice of appeal of the circuit court's judgment. On appeal, Wiggins argues as follows: (1) that the circuit court's finding that his dogs constituted a nuisance was against the manifest weight of the evidence presented at the trial, (2) that an injunction permanently limiting him to no more than six dogs was unjust and unreasonable, and (3) that the circuit court improperly admitted audio recordings of his barking dogs. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND

The plaintiffs and the defendant all reside on a dead-end road, Triton Lane, in rural

1

Jefferson County, Illinois. Larry and Frances Dobbs live on a parcel of property that is directly north of Wiggins's property, and Wayne and Lorena Richard lived on a parcel of property that lies north of the Dobbs property. The Dobbses and the Richards have lived on their property for approximately 30 years. Wiggins purchased his property on Triton Lane in 1995, built a home and dog kennels on the property, and began raising, training, and kenneling bird dogs.

On November 19, 2007, the Dobbses and the Richards filed a complaint against Wiggins that alleged that barking dogs on the Wiggins property constituted a private nuisance. They requested the circuit court to enjoin Wiggins from kenneling dogs on his property or, alternatively, to order him to reduce the number of dogs to a reasonable number and take the steps necessary to adequately suppress the noise caused by any barking dogs.

The circuit court began a two-day bench trial on the plaintiffs' complaint on April 15, 2009. At the trial, Larry Dobbs testified that he had lived on his property on Triton Lane for 30 years and that his wife, Frances, had lived there with him for 16 years. Wiggins's property was directly south of his property line. Larry testified that he enjoyed working outside in his garden, in his flower bed, and around his fish pond, sitting outside on his deck, and hosting cookouts for family members. Wiggins's land used to be farmland, and after Wiggins purchased it in 1995, he began keeping dogs on the property. According to Larry, at first Wiggins "didn't have that many" dogs, and the dogs did not bark much. However, the noise from barking dogs kenneled on Wiggins's property grew worse over time. In an attempt to alleviate some of the noise, Larry planted a row of cedar trees on his property.

Larry told the court that his house was approximately 200 to 250 yards from a barn where Wiggins kenneled many of his dogs. Larry testified that the barking was constant, day and night. The dogs might bark for two straight hours, take a break, and start barking again, but there was never any extended period of time in which they completely quit barking.

2

According to Larry, there was rarely a complete hour in which the dogs did not bark. The dogs barked more when they were being fed or when they thought they were going to be taken out of their kennels. In addition, deer and other wildlife running across the property and coyotes howling at night tended to stir up the dogs.

Larry stated that in 2007 the barking was at its worst. When he went outside to do chores, he did not spend any time outside enjoying his property like he had in the past. He used to enjoy having his windows at his home open, but he now keeps them shut because of the barking noise. According to Larry, the noise was worse during the summer months as compared to the winter months. Larry approached Wiggins sometime in August of 2007 to complain about the noise. During the conversation, Wiggins never said he would do anything about the noise; therefore, Larry called the animal control office. Larry told the court that the animal control office forced Wiggins to comply with kennel licensing requirements but did not do anything about the noise. He admitted that since he had filed his lawsuit, he noticed a decrease in the volume of the barking.

Larry could not say which year's noise level was the worst, but he testified that he reached his "breaking point" in July of 2007. He testified that the noise was less at the time of the trial than in July of 2007 because there were fewer dogs on Wiggins's property; however, the barking noise was still a problem that made it hard for him to enjoy his property. He testified that he could hear the barking from inside his house. Wiggins testified that on February 16, 2009, the parties inspected Wiggins's kennels in preparation for the trial, and at that time, he counted a total of 69 dogs on Wiggins's property. During the inspection, whenever someone arrived, the dogs barked for 20 to 30 minutes before quieting down. After the dogs quieted down, they could carry on a normal conversation in front of the kennels.

Frances testified that she had been married to Larry for 16 years and had lived on their

3

property on Triton Lane since that time. Frances noticed the noise from Wiggins's barking dogs sometime after Wiggins purchased his property. Frances described the barking as "[e]xcessive, continuous, chronic barking." Frances testified: "I'm an early riser and sometimes I would be up five, six in the morning and they would be barking and continue barking for hours. Then, you know, they might quit for half an hour, couple of minutes. Sometimes I would think, oh, thank goodness, you know, they've quit barking and I'd step outside and here they go again and I would have to go back into the house." Prior to Wiggins kenneling dogs on his property, Frances liked to open the windows to her home in the springtime and let fresh air in. Now she no longer liked to open her windows because of Wiggins's barking dogs. Frances claimed that the barking could be heard inside and that she had to turn on a radio or television to drown out the noise. She testified that a lot of nights, she could not go to sleep because of the noise.

She told the circuit court that she was an outdoor person who liked to garden, host barbecues in her yard for friends and family, read outside on her deck, and walk for exercise. However, the barking noise had caused her stress and restricted her and Larry from enjoying any outside activities in their yard. She testified that the dogs barked all day. In describing the extent of the barking, she testified that there were one or two "chronic barkers" that set off the other dogs. There were periods when all the dogs barked, and there were periods when one or two dogs barked, which caused the other dogs to bark or howl. In addition, she heard "a lot of whimpering, whining." From the end of 2007 to the date of the trial, she had not noticed any change in the level or frequency of the barking. She believed that the barking dogs adversely affected the value of their property.

Wayne Richard testified that he had lived on Triton Lane with his wife for 30 years. Wayne testified that his house was 200 to 250 yards north of the Dobbs house. He estimated that his house was approximately 500 yards northwest of Wiggins's property. His house and

the Dobbs house were the houses closest to Wiggins's property. Wayne testified that he liked to garden, mow, and race lawnmowers with his grandson in his yard. In the evenings, he liked to sit outside on his patio and listen to the sounds of nearby wildlife, including coyotes, turkeys, geese, and occasionally, nearby cattle. He testified that the coyotes howling would cause Wiggins's dogs to start barking.

According to Wayne, Wiggins purchased his property on Triton Lane approximately 15 years ago, and the noise from the dogs on Wiggins's property gradually increased over time. He stated that it was noticeable in 2007 and became a "real nuisance" to him in 2007. He described the noise as constant barking, at least one dog all the time. At times, the barking was "substantial" and sounded like thousands of dogs. He testified, "[W]e can't do anything outside without hearing the dogs." Wayne used to like having his windows open, but with the windows open, he could hear the dogs barking from everywhere in the house. He had to close his windows, and he usually turned on his television or his radio so he could not hear the barking. Wayne had been to the Dobbses' property and heard the dogs barking inside and outside of their house as well.

Wayne testified that he had two conversations about the dogs with Wiggins. According to Wayne, Wiggins stated that he wanted to be a good neighbor and had bought some device to quiet the dogs but that he was "within his rights" regardless of how many dogs were barking. Wiggins told Wayne that he moved to the country so he could raise the dogs, and Wayne responded that he moved to the country to get away from noise.

Wayne's wife, Lorena (Lori), testified that she enjoyed various activities outside, including gardening, reading, playing with kids, and cooking out. Now everything she did outside was "to the accompaniment of barking dogs." She did not invite people over for an outside activity very often anymore because of the noise. She used to like to keep the windows in her house open in the spring before it got too hot, but they did not open the

5

windows as often because of the barking, and they no longer slept with the windows open.

According to Lori, when Wiggins moved into the area, he started raising dogs and the noise began to escalate as he accumulated more dogs. Lori testified that, in 2006, she could no longer ignore the noise. Every time she was outside–morning, noon, and evening–she could hear the dogs barking, whining, howling, and yipping. The noise got worse in 2007 and continued through 2009 at the same frequency and intensity. At times, the penned dogs barked so loud she thought they had gotten out and onto her property. Lori testified that she had also heard the dogs barking from both inside and outside of the Dobbs house.

Mary McKowen lived in a house that was approximately 2¼ miles north of the Dobbs house, and she had lived there for approximately 40 years. She was a longtime friend of Larry Dobbs and his family. McKowen testified that when she and her husband, Nolan, were outside on their property, they could hear Wiggins's dogs barking to the south. When the wind was coming from the south, the barking was louder than at other times. McKowen testified that in 2007, Frances Dobbs was redecorating at her house, and during this time, McKowen visited the Dobbs property several times a week, sometimes twice a day. During her visits at the Dobbs residence in 2007, McKowen could hear the dogs barking outside every time she visited, which she felt was very annoying.

Charles Downey lived on Triton Lane approximately one mile north of the Dobbs residence, and he had lived there for nearly 30 years. Downey testified that he heard Wiggins's dogs barking from his property. He could hear the dogs barking when he was outside, but his house was far enough away that the barking did not bother him. Downey had been friends with Larry Dobbs for approximately 30 years. He had been to the Dobbs house at various times and had heard the dogs barking at the Dobbs home. Downey described the barking as "quite a bit louder" at the Dobbs property and testified that the barking would be annoying to listen to all the time.

Downey testified that he also, from time to time, helped Wiggins at his property, including feeding his dogs and horses. In addition, Downey designed and built some of Wiggins's kennels. Downey estimated that in 2007 Wiggins had more than 100 dogs on his property. The dogs barked when he was at the Wiggins property, but most of the time he could "holler at them" and they would quiet down. Downey testified that he would not want to live where the Dobbses lived because he did not want to "listen to the dogs." According to Downey, there were approximately six dogs that barked constantly. He could hear the dogs barking from his property as recently as a week or so before the trial.

Randy Phillips, a contractor, testified that the Dobbses hired him to help with their remodeling project in the spring and summer of 2007. He spent approximately 3½ months at their property building an addition onto the house, tearing off and replacing the roof on the house, replacing the roof on two garages, tearing off and replacing the siding on the house, and tiling the kitchen and dining room. Phillips testified that he would work at the Dobbs home all day and that he could hear the dogs barking all day long. According to Phillips, they never quit barking, and he could hear the dogs from both inside and outside of the house. Although he did not know how many dogs were barking at once, he testified that it was more than one or two dogs.

During cross-examination, Phillips testified that he thought it was not good for a dog to be tied up or confined in a pen. He testified that he had two dogs of his own and that he treated his dogs like they were his kids. He told the court that he hated to see a dog penned. However, he stated that he was different than most people when it came to his dogs and that he was not prejudiced against people who tied up their dogs or penned them outside. He testified that, although he would not pen his own dogs, it did not bother him that Wiggins penned his dogs. He also admitted that there were periods of time that he was making a lot of construction noise that might have caused the dogs to react. However, he testified that the

7

dogs also barked during long periods when he did not make any noise, and he could not remember any time spent at the Dobbs home when he did not hear the dogs barking. He testified that he would not want to live at the Dobbs home and would not consider purchasing the property because of the barking dogs.

Martin Boykin of the Jefferson County Animal Control testified that in January of 2008, he responded to Triton Lane in response to a complaint that a dog owned by the Dobbses was acting aggressively, trying to bite people, and not allowing the mail to be delivered. On that occasion, he spoke with both Wiggins and Larry Dobbs near their property line for at least a half an hour. In describing the barking coming from the Wiggins property during this visit, Boykin testified: "You could hear somewhat some barking but nothing to–you couldn't really tell, I mean, a number of dogs or anything like that. It wasn't nothing loud or, you know, anything that would disturb anyone, I would assume." He told the circuit court that he did not believe the barking level was "disturbing." He testified that he had not been to the property except on that one occasion.

For about 17 years, Randy Childers was the mail carrier for the homes on Triton Lane. He testified that when he delivered the mail, he kept either one window or both windows down on his mail truck. Childers did not recall any noise from Wiggins's dogs when he delivered the mail. He testified that he was there for about a minute, five days a week and that, during that time, he was "delivering the mail [and] not paying much attention to anything else."

At the trial, veterinarian Gordon Rhine testified by way of an evidence deposition. Rhine owned two dogs that lived inside his house, and he owned six dogs that he kenneled outside his house. His kennels were located approximately 150 yards from his nearest neighbor. Rhine testified that he visited Wiggins's property and inspected his kennels. He inspected the kennels for approximately 45 minutes to an hour. He testified that when he

8

first entered the building where some of the kennels were located, the dogs barked, and as he walked around, more dogs barked. Eventually the barking dogs calmed down, although there continued to be some barking throughout the visit. Rhine described Wiggins's kennels as typical bird dog kennels that were pretty clean. According to Rhine, the dogs visually appeared to be healthy and happy.

Wiggins testified that he had been involved in raising and training bird dogs since he was a child helping his grandfather raise and train bird dogs. Wiggins liked to compete in field trials with his dogs, and he had won his first field trial in 1984 or 1986. He won his first national field trial title in 2003. In 1985, Wiggins lived in Goreville, Illinois, and raised and trained approximately 60 dogs. He moved to Kentucky in 1989, and in November of 1995, he moved to the property on Triton Lane in rural Jefferson County, Illinois. When he moved back to Illinois, he had approximately 60 to 70 dogs, and he initially moved approximately half of them to his Triton Lane property. He built kennels on the property for penning all of his dogs, and by 1996, he had 50 to 70 dogs in the kennels on his property. Wiggins testified that from 2002 to 2008, he has had a total income of $139,295 from selling his bird dogs. In addition to raising and training bird dogs, Wiggins also ran his own trucking company, which was his primary source of income.

Wiggins testified that after he moved to his Triton Lane property and built his kennels, he asked Larry several times every year whether his dogs bothered him in any way. According to Wiggins, Larry always told him that the dogs were not a problem and that he could not hear them. Wiggins testified that he had hundreds of such conversations with Larry over the years. However, in a conversation on August 11, 2007, Larry told Wiggins that the barking was out of control and asked him to do something about it. According to Wiggins, that was the first time Larry had complained about the barking in the 15 years he had lived there. At that time, he owned approximately 100 dogs.

9

After that conversation, Wiggins made attempts to reduce the noise level. He believed that there were approximately 20 dogs that barked the most, and he began finding new homes for those dogs. At the time of the trial, he had four of five of the "troublemaker" dogs left. Wiggins also purchased water sprinklers that activated automatically and sprayed the dogs when they barked, he started using 15 or 16 bark collars that he rotated among the dogs, he placed the noisier dogs inside his barn, he used a training muzzle on some dogs, he played the radio for the dogs, and he installed electronic kennel silencers. In addition, he stored bales of hay along the border of Larry's property to absorb some of the sound. Wiggins believed that because of these measures, the dogs were quieter at the time of the trial than they had been in 2007.

At the conclusion of the evidence, the circuit court took the matter under advisement. On July 21, 2009, the circuit court entered a judgment in favor of the plaintiffs. Based on the evidence presented, the circuit court found that Wiggins's dogs barked during all hours of the day and the night. The court found that, although Wiggins's land was well-suited for a dog kennel, the barking dogs resulted in an invasion of the plaintiffs' interest in the use and enjoyment of their lands and that the gravity of the harm done to the plaintiffs outweighed the utility of Wiggins's dog kennels. The court ordered Wiggins to decrease the number of dogs in his possession to no more than six, to kennel his dogs in the southern region of his property, and to take all the steps necessary to adequately suppress any noise caused by any barking dogs. Wiggins filed a timely notice of appeal.

## DISCUSSION

The first argument that Wiggins raises on appeal is that the circuit court's finding that his dogs constituted a nuisance was against the manifest weight of the evidence. We disagree.

"In Illinois, the law is well established that the trial judge, sitting without a jury, has

10

the obligation of weighing the evidence and making findings of fact." *Chicago Investment Corp v. Dolins*, 107 Ill. 2d 120, 124 (1985). "[A]n appellate court will defer to the findings of the circuit court unless they are against the manifest weight of the evidence." *Dolins*, 107 Ill. 2d at 124. Accordingly, in the present case, we will review the circuit court's finding that the barking dogs constituted a nuisance under the manifest-weight-of-the-evidence standard.

"A private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land." *Willmschen v. Trinity Lakes Improvement Ass'n*, 362 Ill. App. 3d 546, 553 (2005). "The invasion must be either intentional or negligent, and unreasonable." *Willmschen*, 362 Ill. App. 3d at 553. In determining whether particular conduct constitutes a nuisance, the standard is the conduct's effect on a reasonable person. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 204 (1997). The Illinois Supreme Court has frequently stated that a nuisance must be physically offensive to the senses to the extent that it makes life uncomfortable. *In re Chicago Flood Litigation*, 176 Ill. 2d at 205. An invasion constituting a nuisance can include noise, smoke, vibration, dust, fumes, and odors produced on the defendant's land and impairing the use and enjoyment of neighboring land. *In re Chicago Flood Litigation*, 176 Ill. 2d at 205-06. Whether the complained-of activity constitutes a nuisance is generally a question of fact. *Pasulka v. Koob*, 170 Ill. App. 3d 191, 209 (1988). In an action to enjoin a private nuisance, the circuit court must balance the harm done to the plaintiffs against the benefit caused by the defendant's use of the land and the suitability of the use in that particular location. *Carroll v. Hurst*, 103 Ill. App. 3d 984, 990 (1982).

In *Woods v. Khan*, 95 Ill. App. 3d 1087, 1088 (1981), the plaintiffs brought a lawsuit to enjoin the defendants' poultry business as a private nuisance. The plaintiffs lived within a mile of the defendants' poultry business in rural Godfrey, Illinois, and they had lived there before the defendants built their facility in the area. *Woods*, 95 Ill. App. 3d at 1088. The

11

neighborhood was zoned agricultural, and many of the plaintiffs raised livestock on their own property. *Woods*, 95 Ill. App. 3d at 1088. The plaintiffs complained that the poultry facility resulted in bad odors and swarms of flies and that the intensity of both varied from day to day. *Woods*, 95 Ill. App. 3d at 1089. Some of the plaintiffs were required to seal their houses when the odor and insects were at their worst, and some plaintiffs cut back on outdoor activities and quit inviting guests to their homes. Some plaintiffs complained of breathing difficulties, sore throats, and nausea. *Woods*, 95 Ill. App. 3d at 1089.

In *Woods*, the court concluded "that the trial court properly determined that the odors and flies were sufficiently bothersome to justify injunctive relief." *Woods*, 95 Ill. App. 3d at 1090. In weighing the gravity of the harm to the plaintiffs against the utility of the defendants' business and the suitability of its location, the court stated that the following questions had to be answered: "(1) Are the defendants engaged in a useful enterprise? (2) Is this area of rural Godfrey well suited for an egg production facility? (3) Which came first, the chickens or the plaintiffs? (4) Can the odors and flies be reduced? (5) Is modification of the facility practical?" *Woods*, 95 Ill. App. 3d at 1090. The court concluded that although the poultry facility was a vital industry, the poultry facility was the "newcomer to the area" and was located too close to several residences.

As noted above, in order to prove an actionable nuisance, the plaintiffs had the burden of proving that barking dogs constituted an invasion that was substantial, intentional or negligent, and unreasonable. The plaintiffs presented sufficient evidence for the circuit court to find the elements necessary to conclude that the barking dogs from the Wiggins property constituted a nuisance.

First, the plaintiffs presented sufficient evidence for the circuit court to find that the barking noise emanating from the Wiggins property was substantial. The plaintiffs presented evidence that Wiggins's barking dogs could be heard inside the plaintiffs' houses. Wildlife

in the area caused the dogs to bark and yelp at all hours of the day and night, and the plaintiffs testified that the constant noise invaded their use and enjoyment of their land. The plaintiffs testified about their enjoyment of outdoor activities but having to curtail those activities because of the noise. The plaintiffs corroborated their trial testimony with the testimony of two other neighbors who also described the barking dogs and the testimony of a contractor who spent more than three months at the Dobbs house working on a remodeling project on a daily basis.

This evidence was sufficient for the circuit court to find that the barking continued for extended periods of time, occurred at all hours of the day and night, and constituted a substantial invasion of the plaintiffs' properties. In determining whether the noise was substantial, the circuit court had to consider the effect it would have on a normal person of ordinary habits and sensibilities. *Statler v. Catalano*, 167 Ill. App. 3d 397, 403 (1988). The circuit court found that the plaintiffs were not "unduly sensitive" and were not "delicate, fastidious, [or] pursuing a dainty way of life." This finding was not against the manifest weight of the evidence. Wiggins disputed the extent of the barking and presented conflicting evidence on that issue, but the circuit court, as the trier of fact, determined the credibility of the witnesses and the weight to be given to the evidence (*Ruiz v. Wolf*, 250 Ill. App. 3d 121, 124 (1993)). We cannot say that the circuit court's finding of a substantial invasion of the plaintiffs' properties was unsupported by the facts presented at the trial.

Second, in order to constitute a nuisance, an invasion must be either intentional or negligent. *Willmschen*, 362 Ill. App. 3d at 553. The plaintiffs presented sufficient evidence for the circuit court to find that the noise invasion was intentional. For purposes of an intentional invasion, it is not necessary for the circuit court to find that Wiggins kenneled the dogs for the purpose of creating noise. Instead, an intentional invasion occurs when the defendant knows that an invasion of another's interest in the use or enjoyment of his or her

13

land is resulting or is substantially certain to result. *Patterson v. Peabody Coal Co.*, 3 Ill. App. 2d 311, 316 (1954). The circuit court found that Wiggins "knew that the barking dogs were an invasion of the Plaintiffs' lands or that it was substantially certain to result." This finding was not against the manifest weight of the evidence presented at the trial. Wiggins kenneled, at times, nearly 100 dogs on his property, knew that he had a few problem dogs that barked frequently, knew that wildlife in the area could set off the dogs, and knew that a few dogs barking often caused a chain reaction, resulting in many of the nearly 100 dogs barking simultaneously. Under these facts, we cannot conclude that it was against the manifest weight of the evidence for the circuit court to find that Wiggins knew that the constant barking noise was substantially certain to be invasive to his neighbors who were located approximately 250 yards away, across an open field.

Third, the circuit court found that the noise nuisance was unreasonable. The resolution of this question of fact required the circuit court to weigh the gravity of the harm done to the plaintiffs against the utility of Wiggins's kennels and the suitability of the location of his kennels. *In re Bloomingdale Partners*, 160 B.R. 101, 109 (N.D. Ill. 1993). The circuit court found as follows:

"That although the Defendant is operating a small business on his property, the gravity of the harm done to the Plaintiffs outweighs the utility of the Defendant's business and the suitability of the location of that business. To make this finding the Court balanced the following:

(a) Defendant is engaged in a useful business (raising bird dogs);

(b) Defendant is located in an area of Jefferson County well-suited for a dog kennel;

(c) Plaintiffs were located on their property before the Defendant started his dog kennel;

14

(d) Although the Defendant has made efforts, the barking of the dogs cannot be reduced to a level that is not a substantial invasion of Plaintiffs' lands; and

(e) There is no practical way to modify the Defendant's kennels to stop the dogs from barking."

The evidence presented at the trial supports the circuit court's findings. The plaintiffs presented testimony from several witnesses to establish that the noise emanating from Wiggins's kennels substantially affected their ability to use and enjoy their homes and land. The plaintiffs bought their property and lived in their homes prior to Wiggins buying his property and constructing his kennels. On the other hand, Wiggins presented significant evidence of the utility of his kennels. The undisputed evidence at the trial established that Wiggins's kennels allowed him to raise and train bird dogs that were monetarily valuable as well as champions in various field competitions around the country. In addition, his kennels were clean, licensed, and well-maintained, and the circuit court found that their location in rural Jefferson County was suitable for a dog kennel. However, Wiggins's primary source of income was from his trucking business, not his kennels. The court also heard evidence that after Larry Dobbs complained about the noise to Wiggins in August of 2007, Wiggins attempted several measures to lessen the noise level, but the measures did not diminish the noise level sufficiently to abate the nuisance.

The circuit court was charged with the task of balancing these conflicting interests to determine whether the intentional invasion of barking noise was an unreasonable invasion and, therefore, an actionable private nuisance. The circuit court heard enough evidence to conclude that 69 or more dogs kenneled on Wiggins's property caused an unreasonable noise invasion that interfered with the plaintiffs' use and enjoyment of their nearby land. The appellate court is not permitted to "substitute its judgment on questions of fact fairly

15

submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). Accordingly, we must affirm the circuit court's finding that the barking from the dogs kenneled on Wiggins's property constituted a private nuisance.

Wiggins argues, alternatively, that even if the plaintiffs sufficiently established that his dogs constituted a nuisance, the remedy issued by the circuit court was improper because it effectively terminated his business without affording him an opportunity to reduce or abate the nuisance. The granting of an injunction is within a trial court's discretion, and on appeal, the reviewing court will only reverse a circuit court's ruling when the circuit court manifestly abused its discretion. *Tamalunis v. City of Georgetown*, 185 Ill. App. 3d 173, 189 (1989). The mere existence of a nuisance does not automatically entitle the plaintiffs to injunctive relief against the nuisance. *Tamalunis*, 185 Ill. App. 3d at 190. "Equity will not, as a matter of course, order relief in nuisance cases until all the circumstances and consequences of such action are considered." *Tamalunis*, 185 Ill. App. 3d at 190.

In the present case, the circuit court entered a permanent injunction requiring Wiggins to decrease the number of dogs in his possession to no more than six, to kennel the dogs only at a location in the southern region of his property, and to take all the steps necessary to adequately suppress any noise caused by the dogs barking. It was not against the manifest weight of the evidence for the circuit court to find that the number of dogs Wiggins kenneled on his property at the time of the trial, 69 dogs or more, constituted a private nuisance given the testimony concerning the noise level even after Wiggins attempted measures to reduce the noise. However, the evidence at the trial was insufficient to support a finding that Wiggins must reduce the number of dogs in his possession to six in order to abate the nuisance. Therefore, an injunction requiring him to reduce the number of dogs in his possession to six or less was an abuse of discretion under the facts presented at the trial.

16

The evidence at the trial suggested that Wiggins might be able to correct the nuisance by reducing the number of dogs to some number fewer than 69 but greater than 6. Wiggins began kenneling dogs on his property beginning in 1995, and he did so for more than 10 years without any complaints from his neighbors. The evidence at the trial included testimony describing several measures Wiggins took after August of 2007 to reduce the barking noise. The circuit court found that these measures were insufficient to abate the noise nuisance from the 69 or more barking dogs. However, the evidence presented at the trial was insufficient to determine the maximum number of dogs that could be maintained on the property without causing a private nuisance.

"The restraint imposed by an injunction should not be more extensive than is reasonably required to protect the interests of the party in whose favor it is granted[] and should not be so broad as to prevent defendant from exercising his rights." *People ex rel. Traiteur v. Abbott*, 27 Ill. App. 3d 277, 282-83 (1975).

Based on the evidence presented at the trial, we cannot determine whether Wiggins can abate the nuisance by reducing the number of dogs on his property to some number fewer than 69 but more than 6. He may be able to reduce the dogs to a number that would allow him to continue his canine business and, along with implementing noise-reduction measures, would reduce the barking noise to a reasonable level. The evidence at the trial was sufficient only for the court to determine that Wiggins could not abate the nuisance with 69 dogs on his property despite his attempts to do so. The evidence was not sufficient for the court to determine the maximum amount of dogs Wiggins could kennel on his property without creating a noise nuisance.

The circuit court found that Wiggins's canine business was a useful business located in an appropriate rural area, and we believe that further evidence is necessary for the circuit court to determine the proper scope of injunctive relief. The circuit court had insufficient

evidence to consider all the circumstances and consequences of injunctive relief limiting Wiggins to six dogs, and we believe that the scope of the injunction was an abuse of discretion based on the evidence before the circuit court. Without further evidence, we cannot determine whether the circuit court's injunction was too broad in scope, creating an unnecessary hardship on Wiggins. We do not offer any opinion on the number of dogs Wiggins should be limited to kenneling on his property; we only conclude that the evidence presented at the trial was insufficient to determine the appropriate remedy. Accordingly, we remand this cause for further proceedings relevant to the scope of the injunctive relief necessary to abate the noise nuisance.

Wiggins maintains on appeal that the circuit court improperly admitted recordings made by the plaintiffs of his dogs barking. We disagree. "Evidentiary rulings are within the sound discretion of the trial court and will be upheld absent an abuse of discretion that resulted in prejudice to the objecting party." *Stallings v. Black & Decker (U.S.), Inc.*, 342 Ill. App. 3d 676, 683 (2003). "An abuse of discretion occurs when no reasonable person would rule as the circuit court ruled." *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 98 (2008). We also note that there is a strong presumption in a bench trial that the trier of fact relied only on proper evidence in reaching its decision on the merits. *Loseke v. Mables*, 217 Ill. App. 3d 521, 524 (1991).

During the trial, the plaintiffs admitted two recordings from digital audio recorders. Sound recordings are generally admissible if a proper foundation is laid, and the proper foundation depends upon the particular circumstances of a case. *People ex rel. City of Leland Grove v. City of Springfield*, 193 Ill. App. 3d 1022, 1041 (1990) (relying on M. Graham, Cleary & Graham's Handbook of Illinois Evidence §901.6, at 634 (4th ed. 1984)). Generally, the authentication of an audio recording is sufficient if a witness testifies to having been present at the time the conversation was recorded and states that the recording

18

" 'fully, fairly, and accurately reflects the conversation.' " *In re Estate of Jones*, 159 Ill. App. 3d 377, 386 (1987) (quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence §901.6, at 634 (4th ed. 1984)). We agree with the plaintiffs that the circuit court did not abuse its discretion in allowing the admission of the sound recordings.

Larry Dobbs identified the digital recorders used to make the recordings, testified concerning where and how he took the recordings, and testified concerning what he did with the recordings after they were made. Both Larry and Frances testified that the portions of the tape recordings played at the trial fairly and accurately reflected what they heard while on their property. Whether the Dobbses manipulated the recording process or whether the recording otherwise accurately depicted the sound level were matters that were properly raised on cross-examination and that went to the weight of the evidence, not its admissibility.

CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the judgment of the circuit court of Jefferson County granting the plaintiffs a permanent injunction, and we remand for further proceedings.


Affirmed in part and reversed in part; cause remanded.


CHAPMAN and DONOVAN, JJ., concur.

19

NO. 5-09-0416

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| LARRY DOBBS, FRANCES DOBBS, WAYNE RICHARD, and LORENA RICHARD, | ) Appeal from the<br>) Circuit Court of<br>) Jefferson County. |
| Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) No. 07-MR-86 |
| | ) |
| DONALD WIGGINS, | ) Honorable<br>) Mark R. Stanley, |
| Defendant-Appellant. | ) Judge, presiding. |

| | |
|---|---|
| **Rule 23 Order Filed:** | April 15, 2010 |
| **Motion to Publish Granted:** | April 30, 2010 |
| **Opinion Filed**: | April 30, 2010 |

| | |
|---|---|
| **Justices**: | Honorable Bruce D. Stewart, J. |
| | Honorable Melissa A. Chapman, J., and<br>Honorable James K. Donovan, J.,<br>Concur |

| | |
|---|---|
| **Attorney**<br>**for**<br>**Appellant** | Terry Sharp, The Sharp Law Firm, P.C., 1115 Harrison, P.O. Box 906, Mt. Vernon, IL 62864 |

| | |
|---|---|
| **Attorney**<br>**for**<br>**Appellees** | Douglas R. Hoffman, Campbell, Black, Carnine, Hedin, Ballard & McDonald, P.C., P.O. Drawer C, Mt. Vernon, IL 62864 |