NOTICE
Decision filed 01/04/21. The
text of this decision may be
changed or corrected prior to
the filing of a Peti ion for
Rehearing or the disposition of
the same.

2021 IL App (5th) 190460

NO. 5-19-0460

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| CONNIE K. WELLS, WILLIAM WELLS, and BRIAN WELLS, | ) ) ) | Appeal from the Circuit Court of Williamson County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 12-MR-15 |
| STATE FARM FIRE AND CASUALTY INSURANCE COMPANY, | ) ) ) ) | Honorable John W. Sanders, |
| Defendant-Appellee. | ) ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court, with opinion.
Justices Cates and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1     The plaintiffs, Connie K. Wells, William Wells, and Brian Wells, owned a warehouse

building located in Marion, Illinois. They purchased a casualty insurance policy from the

defendant, State Farm Fire and Casualty Insurance Company (State Farm), to insure the building

and its contents from accidental loss. In February 2011, during a period of below freezing weather,

the building's water pipes burst, and water from the pipes flooded areas of the building. State Farm

refused to cover the damages. The plaintiffs filed a complaint against State Farm alleging claims

for declaratory judgment, breach of contract, and bad faith claims practices. The plaintiffs

requested the circuit court to construe the insurance policy and find that their loss caused by the

burst water pipes was covered under the policy.

1

¶ 2    As an affirmative defense, State Farm invoked an exclusion in the policy that excluded coverage for damages from burst water pipes unless the plaintiffs did their "best to maintain heat in the building." State Farm asserted that the plaintiffs failed to do their best in maintaining heat in the building and, therefore, it was not liable for any damages. The circuit court bifurcated the triable issues and first conducted a bench trial on State Farm's affirmative defense, placing the burden on State Farm to prove that the policy's exclusion applied. After the bench trial, the circuit court concluded that State Farm carried its burden of proving that the policy exclusion applied. The circuit court, therefore, entered a judgment finding that there was no coverage for the building's water damage under the policy. The plaintiffs now appeal the circuit court's judgment.

¶ 3                                     I. BACKGROUND

¶ 4    The insurance policy in this case required State Farm to insure the plaintiffs' building and its contents for accidental loss. However, the policy exclusion at issue in this case stated that the policy does not insure for loss caused by "water that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by freezing unless: (1) *you do your best to maintain heat in the building or structure*." (Emphasis added.) At the beginning of the trial, the circuit court held that State Farm had the burden of proving the facts necessary to establish that the policy exclusion applies. Three witnesses testified at the trial: (1) coplaintiff William Wells, (2) a heating, ventilation, and air conditioning (HVAC) and electrical contractor who testified as an expert on behalf of the plaintiffs, and (3) a State Farm claims adjuster supervisor.

¶ 5    William's testimony established that he purchased the building in 1994 and that he owned the building along with his wife, Connie, and his son, Brian. William lived in the building for a period of time and later converted the building into a law office. When William lived in the

2

building, its heating system included a furnace and a heat pump. Nonetheless, on three occasions while William lived in the building, the building's water pipes burst while the furnace and heat pump were both in operation. According to William, on those occasions, the circuit breaker had tripped. William testified that these incidents led him "to believe that the furnace was a dangerous way to prevent freezing during really cold times."

¶ 6    Sometime in 2010, the building's heat pump was stolen. The plaintiffs made a claim for the stolen heat pump, and State Farm paid the plaintiffs the replacement costs for the heat pump less the policy deductible. The plaintiffs, however, never replaced the heat pump. According to William, he had the furnace and circuit breakers checked and found that "[n]othing was wrong." However, because of his prior experience, he did not believe that the furnace was reliable. Despite the fact that the building's heating system was inadequate to keep the building's pipes from bursting, there is no evidence that the plaintiffs did anything further to repair or replace the building's heating system to bring it into proper working order. Instead, at some point, the plaintiffs shut off water service to the building.

¶ 7    The building was used for many years by William primarily as a storage facility. In addition, William operated a "debt settlement business" that required him to be at the building once or twice a week to get files and make cellphone calls for debt settlements. During this period, William was never at the building for more than a couple of hours at a time. According to William, Brian began remodeling work at the building. Therefore, in January 2011, the plaintiffs turned the water back on for Brian's convenience while working at the building. Again, prior to this time, the plaintiffs had not repaired or replaced the building's insufficient and unreliable heating system although they had years to do so.

¶ 8    Shortly after turning the building's water back on, in February 2011, during a period of below freezing weather, William cordoned off a 400 square foot area where the building's water pipes were exposed and set up three space heaters in the cordoned off area in order to prevent the pipes from freezing. In addition, as further precaution against freezing pipes, William also left water dripping slowly from a sink faucet. William testified that he believed that the building's furnace was turned on when the water was turned on, but the thermostat was turned down to around 40 degrees. However, he agreed that when he turned on the water, he "never really checked [the furnace] to see if it worked."

¶ 9    William testified that he set up the three space heaters in the cordoned off area because he did not believe the building's furnace was reliable but "was sure that the three space heaters were adequate to heat that space." He testified that he believed that the space heaters were sufficient because he had used space heaters in this area of the building before, and the space heaters prevented the pipes from freezing. In addition, according to William, the space heaters had never caused the building's breakers to trip. William also testified that he made sure that the space heaters were plugged into outlets on circuits different than the circuit the furnace was on. He testified that, for one of the space heaters, he used a 20- or 30-foot extension cord that was plugged into a back room and led to the utility room where, according to William, the trouble always occurred when pipes froze. William testified that he plugged the other two heaters into outlets that were near the utility room but were on separate circuits.

¶ 10    At the trial, the plaintiffs offered into evidence the building's floor plan which showed the area that William had cordoned off. The cordoned off area included a kitchen, utility room, and a bathroom which, according to William, were the only areas of the building where water pipes were

4

located. William cordoned off the area by placing a plastic partition that blocked the only doorway that led to the heated area.

¶ 11    William testified that, after setting up the space heaters, he returned to check on the building a day or two later, after a night that was particularly cold. During this inspection, William saw that none of the building's pipes had burst and that water was still dripping slowly from the sink's faucet. A few days later, on February 15, 2011, William returned to the building and discovered that the water pipes in the building had burst which, in turn, had caused flooding in portions of the building.

¶ 12    The plaintiffs submitted a claim for the loss to State Farm, and State Farm initially sent a contractor to begin cleanup of the water damage. However, State Farm discontinued the cleanup effort before it was completed and ultimately rejected the plaintiffs' claim. On February 25, 2011, State Farm sent a letter to the plaintiffs informing them that it was denying the claim following an inspection that took place on February 18, 2011.

¶ 13    When State Farm denied the plaintiffs' claim, William filed a complaint with the Illinois Department of Insurance. This complaint filed with the Illinois Department of Insurance was admitted into evidence at the trial. In the complaint, William wrote about the incident as follows:

> "On Tuesday evening (2/18/11) we discovered that our building had flooded. The flood was the result of frozen pipes. We also discovered that two of the three space heaters that were heating the area were not functional. One heater had apparently broken down. The second heater was plugged into an outlet that had a popped circuit breaker. (When we tested the circuit breaker, even after all the water was removed from the building, we discovered that the circuit breaker still would not stay on.)"

5

¶ 14   At the trial, the plaintiffs presented the testimony of Jeff Castellano, who was an HVAC and electrical contractor. Castellano testified that in December 2017 he inspected the building, the space heaters that William used to heat the cordoned off portion of the building, and the outlets that William identified as the locations where he plugged in the space heaters. Castellano testified that the outlets were on three separate circuits and that each circuit would have been sufficient to handle a heater. There was no power on at the building when Castellano conducted his investigation. However, he testified, "I had separated each of the circuits and ran continuity from the plug to the breaker." He explained that he turned the breakers on and off and that the breakers seemed to work. He admitted, however, that without power he would not know whether there was a short in the circuit or other problem causing the breaker to trip repetitively. Therefore, he did not know "whether those heaters were overloading those circuits on a regular basis." He also agreed that water hitting one of the plugs could trip a breaker and that he did not know when any breaker for any of the circuits where the space heaters were plugged into may have tripped.

¶ 15   Castellano testified that each space heater could heat approximately 150 square feet. He measured the cordoned off area and concluded that the three space heaters were sufficient to heat the area. Castellano also testified that, although he observed an extension cord in one of the rooms, he was not aware that any of the heaters were plugged into an extension cord. Instead, he was told by William or Connie that the space heaters were plugged directly into the wall outlets. Castellano agreed that he probably did not check the outlet that William testified the extension cord was plugged into. He also agreed that most manufactures warn against using space heaters with an extension cord "over a long distance." He stated that it "[d]epends on the cord and the distance." Castellano opined that if he owned the building, he would have "felt comfortable" using the three

6

heaters plugged into the three outlets to "protect [the] building," although he also testified that use of space heaters was not ideal and should not be used for long periods of time.

¶ 16    State Farm presented the testimony of one of its supervisors of claims adjusters, Alyssa Midla. Midla testified that she supervised the claims adjuster handling the plaintiffs' claim for the building damage. Midla testified that she never personally visited the building but that she discussed the plaintiffs' claim with the claims adjuster and had reviewed the claim file prior to her testimony. According to Midla, the adjuster that handled the plaintiffs' claim went to the building to investigate how the plaintiffs had heated the building, and the claims adjuster then learned that the plaintiffs had used space heaters. Therefore, according to Midla, State Farm concluded that the plaintiffs' loss was not covered under the policy because the plaintiffs failed to "do their best [to maintain heat in the building] because of the use of space heaters."

¶ 17    On cross-examination, Midla agreed that she had no personal knowledge of "what kind of set up was in the building" other than the diagram and photographs in the claim file. She also agreed that she was not an electrician or an HVAC technician, although she had been trained on "everything building related" in order to estimate damages. According to Midla, the claims adjuster who "made the call" to deny the plaintiffs' claim was no longer employed with State Farm, and he did not testify at the trial.

¶ 18    During cross-examination, the plaintiffs' attorney asked Midla about a report in State Farm's claim file that includes the reason State Farm denied the plaintiffs' claim. The plaintiffs' attorney offered the report into evidence, and the report provided, in part, as follows:

> "Insured has a furnace, which he believes is operational, but not using because he does not want to pay to heat the entire building because it's not used every day. Insured has been using space heaters to heat the spaces in vicinity of plumbing lines. Only turns them on

7

when he hears it's going to be cold. Ceiling and utility area where pipes froze is open to roof framing, allowing heat to escape. Space heaters are not intended or designed to serve as a primary heat source, and one of the heaters failed/breaker was tripped when insured found the damages, which is a common problem with these types of heaters. Insured did not do his best to maintain heat, as required by the policy. Proceed to deny."

¶ 19 During her testimony, Midla agreed that State Farm had no evidence to present to establish that any of the building's breakers tripped because of an overloaded breaker. She agreed that, after the damage occurred, the water could have caused one of the building's breakers to trip. Although she testified that State Farm's concern was that the water pipes were open in the building where there was no insulation, on cross-examination, she agreed that she was not aware of whether or not there might have been insulation where the water pipes were before they burst.

¶ 20 When asked whether she believed space heaters were "inherently insufficient" to heat a limited space with water pipes, Midla replied, "No. It all depends on the situation." With respect to the plaintiffs' building, Midla explained:

"So this is a space that has primary heating; so it has primary heating available that's not being used. It's a large space; so I understand that there was—or there's been testimony that there was an attempt to try and limit the space that was being heated. It's a large space. There's several areas that have water pipes that run to it. There was several days on end that no one was there. There were below-freezing temperatures during the time. It—all of those factors, taken into consideration together, that that wasn't sufficient."

¶ 21 Midla admitted, however, that she did not know whether the furnace was operable and that the claims adjuster's notes indicate that he did not know whether the building's furnace was operable.

¶ 22    At the conclusion of the trial, the circuit court took the matter under advisement. On July 31, 2019, the circuit court entered a judgment in favor of State Farm, finding that the policy exclusion applied. The circuit court found that the plaintiffs were aware that the furnace "did not work well and would throw a circuit breaker when it would run and, therefore, [William] had the furnace turned completely down." Therefore, the plaintiffs chose to heat the rooms that contained water pipes with space heaters. The court found that because the outlets did not work properly, it was necessary for the plaintiffs to use an extension cord for one or more of the heaters and that the space heaters were the only heat source at the time the pipes froze. The court concluded that the standard "is one of reasonableness, *i.e.*, whether the actions taken by [p]laintiffs in maintaining heat in the building were reasonable." The court concluded, "Based on the evidence presented to the court and the testimony of the witnesses, the Court finds [State Farm] has met its burden of proof regarding its affirmative defense and, therefore, the relief sought by the [p]laintiff[s] is hereby denied."

¶ 23    The plaintiffs filed a motion to reconsider, emphasizing that State Farm had the burden of proof and that the only witness State Farm called was Midla, who was not an expert on heating and had never visited or inspected the building. The plaintiffs also argued that the circuit court made findings of fact that were not supported by the record. The circuit court denied the motion to reconsider, noting that the plaintiffs failed "to show that the court misapplied the existing law to the facts of the case, especially given the testimony regarding [p]laintiffs' lack of care of the building during the winter and use of space heaters knowing that there was not an adequate, working furnace in the building." The plaintiffs now appeal the circuit court's judgment.

II. ANALYSIS

¶ 25    In analyzing the circuit court's judgment, the first issue we must address is the proper allocation of the burden of proof. Our supreme court has long held that the burden rests with the insureds to prove that their claim falls within the coverage of its policy. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009). Once the insured has demonstrated coverage, the burden shifts to the insurer to prove that a limitation or exclusion applies. *Id.* at 453-54; *Erie Insurance Exchange v. Compeve Corp.*, 2015 IL App (1st) 142508, ¶ 18.

¶ 26    Here, the parties agreed that the allegations of the complaint established a loss that fell within, or potentially within, the insurance policy's coverage. The parties and the circuit court then all agreed that the burden shifted to State Farm to prove that the exclusion in the policy applied to the plaintiffs' claim. We disagree with the circuit court's allocation of the burden of proof.

¶ 27    An exclusion in an insurance policy is a provision that eliminates coverage that would have existed in the absence of the exclusion. *Coppi v. West American Insurance Co.*, 524 N.W.2d 804, 813 (Neb. 1994). An exception to an exclusion is a provision that preserves coverage that would have been excluded by the exclusion in the absence of the exception. *Avemco Insurance Co. v. Auburn Flying Service, Inc.*, 242 F.3d 819, 822 n.3 (8th Cir. 2001); *Royal Insurance Co. of America v. Thomas*, 879 So.2d 1144, 1149 (Ala. 2003). Here, the policy exclusion provided that the State Farm policy was not insuring for losses caused by water leaks from frozen plumbing. However, this exclusion included the following exception, "unless: (1) you do your best to maintain heat in the building or structure." Accordingly, the issue before the circuit court was not whether the policy exclusion applied but whether an exception to the policy exclusion applied.

¶ 28    Illinois courts have not decided the allocation of the burden of proof in such circumstances. See *Erie Insurance Exchange*, 2015 IL App (1st) 142508, ¶¶ 18-19 (noting the unresolved issue).

However, the Seventh Circuit, applying Illinois law, has stated that while insurers have the burden of proving that an exclusion applies, "[i]nsureds, in turn, have the burden to prove that an exception to an exclusion restores coverage." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Insurance Co.*, 611 F.3d 339, 347 (7th Cir. 2010); see *Varlen Corp. v. Liberty Mutual Insurance Co.*, 924 F.3d 456, 460 n.2 (7th Cir. 2019) (under either New York or Illinois law the insured bears the burden of proving that the exception to the exclusion applies); *Professional Solution Insurance Co. v. Giolas*, 297 F. Supp. 3d 805, 815 (N.D. Ill. 2017). A majority of reported cases from other jurisdictions also place the burden of proof with the insured to prove that an exception to a policy exclusion applies to restore coverage taken away by the exclusion. 17A Couch on Insurance § 254:13 (Lee R. Russ *et al.* eds., 3d ed. rev. 2014). ("The trend clearly appears *** to place the burden on insureds to prove that an exception to an exclusion applies to restore coverage.").

¶ 29    We agree with the majority view that the insureds have the burden of proving that an exception to a policy exclusion applies. We believe this is particularly true in the present case where the plaintiffs are most likely to have the relevant information about their efforts to maintain heat in the building and where they are relying on the exception to the exclusion to restore coverage eliminated by the exclusion. See *id.* ("As a generality, the view that the insured bears the burden of showing that an exception to an exclusion applies, restoring coverage, is consistent with both the view that the burden should follow the benefit, and the view that the burden is to be placed on the party with the best access to the information that will be required to carry the burden."); *Smith v. State Farm Fire & Casualty Co.*, 656 N.W.2d 432, 436 (Minn. Ct. App. 2003) (once the insurer shows the application of an exclusion clause, the burden of proof shifts back to the insured because the exception to the exclusion restores coverage for which the insured bears the burden of proof).

11

Accordingly, in the present case, we believe that the plaintiffs had the burden of proving that they did their best to maintain heat in the building in order for there to be coverage for their loss.

¶ 30     Next, we must determine the standard by which the courts are to measure whether the plaintiffs did their best to maintain heat in the building. The specific policy language states that State Farm does not insure for any loss caused by "water that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by freezing *unless: (1) you do your best to maintain heat in the building or structure*." (Emphasis added.) To define this standard, we must interpret the meaning of phrase "you do your best to maintain heat in the building or structure."

¶ 31     "The rules for construction of an insurance contract are well established." *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 20. In construing an insurance policy, the court must ascertain the intent of the parties to the contract. *Illinois Insurance Guaranty Fund v. Chicago Insurance Co.*, 2015 IL App (5th) 140033, ¶ 20. Courts construe the policy as a whole with due regard to the risk undertaken, the subject matter that is insured, and the purpose of the entire policy. *Id.* If the words used in the policy are unambiguous, courts afford them their plain, ordinary, and popular meaning. *Id.* "If the words in a policy are susceptible to more than one reasonable interpretation, however, the court must consider them ambiguous and construe them strictly against the insurer that drafted the policy and in favor of the insured." *Bituminous Casualty Corp.*, 2013 IL App (5th) 120485, ¶ 20. "[T]he absence of a definition does not render a policy term ambiguous, nor is it ambiguous simply because the parties can suggest creative possibilities for its meaning." *Smith v. Neumann*, 289 Ill. App. 3d 1056, 1064 (1997). The construction of an insurance policy is a question of law that we review *de novo*. *Pekin Insurance Co. v. Wilson*, 391 Ill. App. 3d 505, 509 (2009). We also note that the courts will liberally construe any doubt as to

12

coverage in favor of the insured and against the insurance company, especially when the insurance company seeks to avoid coverage based on an alleged exclusion in the policy. *Johnson Press of America, Inc. v. Northern Insurance Co. of New York*, 339 Ill. App. 3d 864, 871-72 (2003).

¶ 32 The phrase "do your best" is not defined within the policy language. In addition, the parties, the circuit court, and our own research has not uncovered any Illinois cases interpreting this phrase. In the proceedings below, the parties and the circuit court agreed that the phrase "do your best" set out a "reasonableness" standard. Therefore, the circuit court concluded that, for insurance coverage to apply, the plaintiffs must have made a "reasonable effort" to maintain heat in the building. In concluding that a reasonableness standard applies, the parties and the circuit court relied on the reasoning set out in *Sonrob Hosts, LLC v. Lafayette Insurance Co.*, No. 3:11-CV-03094, 2012 WL 5336966 (W.D. Ark. Oct. 26, 2012).[1]

¶ 33 In *Sonrob*, the court was called upon to interpret a commercial insurance policy that contained an exclusion that was identical to the exclusion at issue in this case. Specifically, the exclusion in *Sonrob* provided that the insurer would not pay for loss or damage resulting from freezing water pipes unless " '[y]ou do your best to maintain heat in the building or structure.' " *Id.* at *3 (we also note that the *Sonrob* court described this language as an "exception to the exclusion"). The structure at issue in *Sonrob* was a motel, and the insurer declined coverage of water damage resulting from a burst pipe in one of the motel rooms that burst when frozen. *Id.* at *1. The insurer denied the claim based on the exclusion in the policy. *Id.* at *3.

¶ 34 In determining whether the policy exclusion applied, the *Sonrob* court noted that the policy did not define "do your best" to maintain heat. The court, therefore, construed the policy in favor

---

[1]An unpublished federal decision is not binding or precedential in Illinois courts, but Illinois courts may follow the same reasoning if the reasoning is persuasive. *Morris v. Union Pacific R.R. Co.*, 2015 IL App (5th) 140622, ¶ 51 n.1.

of the insureds, holding that the exception to the exclusion imposed a duty on the insureds to use "reasonable efforts" to maintain heat while exercising good faith and sound judgment. *Id.* at \*7.

¶ 35    Similarly, in other contexts, the courts have held that the similar phrase "best efforts" was the equivalent of "reasonable efforts." *Stewart v. O'Neill*, 225 F. Supp. 2d 6, 11 (D.D.C. 2002) (stating that "the agency was obligated to use its best efforts—that is, all reasonable efforts—to comply with all terms of the settlement agreement"); *Soroof Trading Development Co. v. GE Fuel Cell Systems LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) (holding that New York courts use the term reasonable efforts interchangeably with best efforts); *Coady Corp. v. Toyota Motor Distributors, Inc.*, 361 F.3d 50, 59 (1st Cir. 2004) (" 'Best efforts' is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun \*\*\*."); *Perma Research & Development Co. v. Singer Co.*, 308 F. Supp. 743, 748 (S.D.N.Y. 1970) (" 'Best efforts,' like 'reasonable care,' is a term which necessarily takes its meaning from the circumstances."). We also note that Black's Law Dictionary states that "[b]est efforts are measured by the measures that a reasonable person in the same circumstances and of the same nature of the acting party would take." Black's Law Dictionary (10th ed. 2014).

¶ 36    Accordingly, in the present case, we agree with the circuit court and the parties that the exception to the policy's exclusion required the plaintiffs to use "reasonable" efforts to maintain heat in the building. We interpret the phrase "do your best" as requiring the plaintiffs to use reasonable efforts to maintain heat and that the plaintiffs' reasonable efforts are to be measured in light of the specific circumstances they faced. See also *Van Natta v. Great Lakes Reinsurance (UK) SE*, 462 F. Supp. 3d 113, 126 (D. Conn. 2020) (whether the plaintiff acted reasonably in maintaining the heat is an objective inquiry; the question is whether the plaintiff acted as a reasonably prudent person would under the circumstances).

14

¶ 37     Also, with respect to our standard of review on appeal, we note that, in contract settings, Illinois courts have held that whether a party has employed "best efforts" or "reasonable efforts" is a question of fact. *Coleman v. Madison Two Associates*, 307 Ill. App. 3d 570, 578 (1999) ("[T]he question of whether a party has satisfied its 'best efforts' *** is one of fact."); *Osten v. Shah*, 104 Ill. App. 3d 784, 786 (1982) (whether purchasers employed "reasonable efforts" in obtaining a first mortgage loan as a condition of their real estate contract with vendors was a question of fact). Accordingly, in the present case, we believe that the issue of whether the plaintiffs did their best to maintain heat in the building presented the circuit court with a question of fact to be determined by the trial judge sitting as the trier of fact in the absence of a jury.

¶ 38     With respect to questions of fact, a circuit court sitting without a jury has the obligation of weighing the evidence and making findings of fact. *Dobbs v. Wiggins*, 401 Ill. App. 3d 367, 375 (2010). On factual issues, we will defer to the circuit court's findings unless they are against the manifest weight of the evidence. *Id.* A judgment is against the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence. *System Development Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561, 570 (2009). On review, our task is not to retry the issue *de novo* but is to evaluate the evidence presented at the trial and determine whether the circuit court's finding is supported by the evidence. See *Best v. Best*, 223 Ill. 2d 342, 348-49 (2006) ("When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence.").

¶ 39     In challenging the manifest weight of the evidence, the plaintiffs note that State Farm called only one witness (Midla), who had no personal knowledge of the condition of the plaintiffs' building and was not an expert in heating or electrical wiring. State Farm, however, argues that

15

even though it called only one witness, the record, nonetheless, includes sufficient evidence to support the circuit court's factual finding that the plaintiffs failed to exercise reasonable efforts to maintain heat in the building. We agree with State Farm's assessment of the evidence presented at the trial.

¶ 40 William testified that when he lived in the building years before the incident at issue, the building's water pipes froze and burst on three prior occasions. At that time, the building was heated by a furnace and heat pump. According to William, on those prior occasions, a circuit breaker had tripped, causing the furnace to fail. Sometime after these occasions, the building's heat pump was stolen, and William disconnected water service to the building. Obviously, at that point, frozen water pipes became a nonissue.

¶ 41 However, when Brian began remodeling work at the building, the plaintiffs restored water service at the building in the middle of the winter (January 2011). At that point, frozen water pipes became an issue again. However, when William restored water service to the building, he knew that the building's furnace was inadequate to prevent the building's pipes from freezing. He specifically testified that the building's heating system was not reliable for protecting against frozen water pipes. In addition, when William restored the building's water service, the building's heating system was further disadvantaged in that it no longer had a heat pump. Therefore, the building's heating system was in worse shape than it was when the building's pipes froze on three prior occasions. Despite these known problems with the building's heating, William made no effort to repair or replace the building's heating system in order to restore it to a state where it could be relied on to protect the building's pipes from freezing. In addition, the plaintiffs offered no explanation concerning why they failed to even attempt a repair of the building's heating system before turning the water back on.

¶ 42    Under the plain language of the policy exclusion, State Farm agreed to cover a loss due to frozen water pipes but only if the insureds did their part in maintaining proper heating in the building. Here, William simply restarted water service to the building during the middle of the winter knowing that the building's heating system was insufficient to keep the building's pipes from freezing. Based on this evidence, a rational trier of fact could find that reasonable efforts to maintain heat in the building would necessarily require some effort on the part of the plaintiffs to restore the building's heating system to proper working condition before turning on the building's water. The plaintiffs offered no evidence of this effort or any explanation of their lack of effort.

¶ 43    Although William testified that he turned the building's thermostat to 40 degrees, when the pipes burst, he did not know whether the furnace was turned on or whether it even worked. He did know that, even if it did work, it was not sufficiently reliable in its current state to heat the building. During cross-examination, William testified that he "could have called someone if he had wanted the furnace on." The evidence presented at the trial suggests that he chose not to do so.

¶ 44    Instead of repairing the building's heating system, the plaintiffs elected to cordon off a small area in the building where water pipes were located. Their effort was not to maintain heat in the entire building but to add heat to only a small area of the building, temporarily. The trier of fact was entitled to find that the temporary placement of the space heaters in a small cordoned off area of the building is not reasonable efforts to "maintain heat in the building." Perhaps this effort might be reasonable in emergency situations. Here, however, the plaintiffs had years to remedy the building's defective heating system, and they chose not to do so. The circuit court could find that reasonable efforts to maintain heat in the building would require some effort to restore the building's heating system to a condition where it could adequately heat the *entire* building sufficiently to prevent the building's pipes from bursting. This is particularly true when the

17

plaintiffs' own expert, Castellano, testified that the space heaters were insufficient to heat the entire building and that the space heaters should not be used for long periods of time.

¶ 45    Also, in determining whether the plaintiffs made reasonable efforts to "maintain" heat in the building, the circuit court was entitled to give substantial weight to evidence that William left the space heaters unattended for two or three days during extremely cold weather knowing that one or more of the building's circuit breakers had tripped in the past during extremely cold weather and without having attempted to diagnose and remedy the cause of the tripped breakers. In addition, William testified that he placed the space heaters on February 8 or 9, 2011, but the water service was restored on January 20, 2011. Therefore, the building had either no heat source or only heat from the knowingly inadequate furnace from January 30 to February 8 or 9. The plaintiffs presented no evidence of *any* efforts to maintain heat in the building prior to the temporary placement of the space heaters.

¶ 46    On appeal, the plaintiffs highlight the testimony of their expert, Castellano, to support their assertion that the three space heaters constituted reasonable efforts to maintain heat in the building. The plaintiffs also emphasize that State Farm did not present any expert testimony. However, we note that the circuit court had the exclusive task of determining what weight, if any, to give Castellano's testimony. In addition, the circuit court was entitled to consider State Farm's cross-examination of Castellano in assessing the weight to give his testimony.

¶ 47    On cross-examination, Castellano testified that when he inspected the building, the power to the building had been shut off. Therefore, Castellano could not determine whether the space heaters overloaded the building's circuits, causing the breaker to trip during the below freezing weather. Castellano agreed that the three space heaters were insufficient to heat the entire building, and he testified that he would never use space heaters to heat a building for more than a day or

18

two. During cross-examination, Castellano was asked, "And, in your opinion, it's not reasonable to use space heaters long-term to heat a building." Castellano answered that he agreed that it was not a reasonable long-term solution to heating the building, adding, "It's not the best, no." Castellano also agreed that if all three space heaters were functioning at the time the pipes froze, that would mean that the space heaters were insufficient to keep the pipes from freezing. The trier of fact was entitled to consider the entirety of Castellano's testimony and could find that portions of his testimony weighed against finding that the plaintiffs' effort to maintain heat in the building with space heaters was reasonable.

¶ 48     On appeal, the plaintiffs argue that some of the circuit court's findings were not supported by the evidence. For example, the circuit court found that William used an extension cord for one of the space heaters because "the outlets did not work properly." We agree with the plaintiffs that the record does not support this finding. William testified that he used an extension cord so that each space heater was on a different circuit. However, we also note that Castellano testified that he was told that each space heater was plugged directly into an outlet. Accordingly, the record contains conflicting evidence regarding the use of an extension cord. Regardless, evidence about the plaintiffs' use of an extension cord for one of the space heaters does not factor into our analysis under the manifest weight of the evidence as set out above.

¶ 49     The plaintiffs also complain that the circuit court incorrectly found that the space heaters were the only source of heat at the time the pipes froze. The plaintiffs emphasize that no one knows whether the furnace was functioning. As we explained above, however, the plaintiffs knew that the furnace was insufficient to prevent the building's pipes from freezing based on their prior experience. In addition, their lack of knowledge with respect to whether the furnace functioned

19

when the pipes burst undermines any argument that the plaintiffs did their best to maintain heat in the building.

¶ 50    After a comprehensive review of the record, we believe that the circuit court was entitled to find, based on the evidence presented at the trial, that the plaintiffs failed to make reasonable efforts to maintain heat in the building. When the plaintiffs restored water service to the building, they did so in the middle of winter knowing "that the furnace was a dangerous way to prevent freezing during really cold times." They made no effort to remedy the known problem with the building's heating system although they had years to do so. Alternatively, at the trial, they failed to offer any explanation or justification concerning why they did not try to remedy the building's heating problem before turning the building's water back on. The plaintiffs were not required to repair the building's heating system, but when they elected not to do so and decided to turn on the building's water under these circumstances, they turned on the water to the building at their own risk of loss from burst water pipes. Accordingly, under the manifest weight of the evidence standard, we must affirm the circuit court's judgment in favor of State Farm.

¶ 51                        III. CONCLUSION

¶ 52    For the foregoing reasons, the circuit court's judgment is hereby affirmed.


¶ 53    Affirmed.

**No. 5-19-0460**

| | |
|---|---|
| **Cite as:** | *Wells v. State Farm Fire & Casualty Insurance Co.*, 2021 IL App (5th) 190460 |
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, No. 12-MR-15; the Hon. John W. Sanders, Judge, presiding. |
| **Attorneys for Appellant:** | Alfred E. Sanders Jr., of Sanders & Associates, of Marion, for appellants. |
| **Attorneys for Appellee:** | Joseph M. Baczewski, of Brandon & Schmidt, of Carbondale, for appellee. |