2022 IL App (1st) 210802-U

No. 1-21-0802

Order filed August 17, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) ) | Appeal from the Circuit Court of |
| Plaintiff and Counterdefendant-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| WALSH/K-FIVE JV (I-14-4208); WALSH/K-FIVE JV (I-14-4209); WALSH CONSTRUCTION COMPANY II, LLC/K-FIVE CONSTRUCTION COMPANY JV, a Joint Venture; WALSH CONSTRUCTION COMPANY II, LLC; K-FIVE CONSTRUCTION CORPORATION; ARCH INSURANCE COMPANY; and ROYCE BROWN, | ) ) ) ) ) ) ) ) ) | No. 18 CH 6143 |
| Defendants, | ) ) | |
| (Walsh/K-Five JV (I-14-4208), Walsh/K-Five JV (I-14-4209), Walsh Construction Company II, LLC/K-Five Construction Company JV, a Joint Venture, Walsh Construction Company II, LLC, and K-Five Construction Corporation, Defendants and Counterplaintiffs-Appellees). | ) ) ) ) ) ) ) | Honorable Anna Helen Demacopoulos Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's rulings that granted defendant Walsh Construction Company II, LLC's motion for a partial judgment on the pleadings, granted defendants Walsh/K-Five JV (I-14-4208), Walsh/K-Five JV (I-14-4209), Walsh Construction Company II, LLC/K-Five Construction Company JV and K-Five Construction Corporation's motions for partial summary judgment and denied plaintiff Westfield Insurance Company's motions for summary judgment where plaintiff had a duty to defend defendants.

¶ 2    Plaintiff Westfield Insurance Company (Westfield) filed a declaratory judgment action seeking a determination that it owed no duty to defend or indemnify defendants Walsh/K-Five JV (I-14-4208), Walsh/K-Five JV (I-14-4209), Walsh Construction Company II, LLC/K-Five Construction Company JV (collectively referred to as the Joint Venture), Walsh Construction Company II, LLC (Walsh) and K-Five Construction Corporation (K-Five) in an underlying personal injury lawsuit that occurred at a construction site at which Walsh and K-Five were operating a joint venture. In the underlying lawsuit, Royce Brown (Brown), an employee of VMR Contractors, Inc. (VMR), a subcontractor at the construction site, injured himself carrying rebar. Westfield had issued a commercial general liability insurance policy to VMR for its work at the construction site. The Joint Venture, Walsh and K-Five filed a counterclaim against Westfield seeking a determination that it did have a duty to defend and indemnify them in the Brown litigation, as they constituted additional insureds under VMR's policy with Westfield.

¶ 3    As the litigation proceeded, Walsh filed a motion for a partial judgment on the pleadings. After finding that Westfield owed Walsh a duty to defend, the circuit court granted Walsh's motion. Thereafter, Westfield, the Joint Venture and K-Five filed cross-motions for summary

judgment. After finding that Westfield owed the Joint Venture and K-Five a duty to defend, the circuit court granted the Joint Venture and K-Five's motions and denied Westfield's motion. Westfield now appeals those rulings and contends that neither K-Five nor the Joint Venture constituted additional insureds under VMR's policy and even if they did, the joint venture exclusion in the policy eliminated their coverage as well as Walsh's coverage. As such, Westfield argues that it had no duty to defend Walsh, K-Five or the Joint Venture, and the court's rulings finding as such must be reversed.

¶ 4                                I. BACKGROUND

¶ 5                             A. The Joint Ventures

¶ 6     In late 2014, Walsh entered into two line-item joint venture agreements with K-Five (named Walsh/K-Five JV (I-14-4208) and Walsh/K-Five JV (I-14-4209)) to bid on two separate contracts (I-14-4208 and I-14-4209) from the Illinois State Toll Highway Authority, which involved pavement widening and bridge reconstruction work on the Jane Addams Memorial Tollway. Walsh and K-Five memorialized the terms of their joint ventures in written agreements, in which they agreed to constitute themselves as joint ventures in order to submit bids to the Illinois State Toll Highway Authority "for the purpose of performing and completing the construction of the [tollway] [p]roject in the event that the [c]ontract is awarded to them but not for any other purposes."

¶ 7     Each agreement designated Walsh as the lead contractor and managing partner of the joint ventures and authorized it to negotiate and execute any necessary subcontracts. Under the agreements, Walsh and K-Five were required to obtain various types of insurance including commercial general liability insurance. Further, the Joint Venture, Walsh (if K-Five was the named insured on the policy) and K-Five (if Walsh was the named insured on the policy) were required

to be named as additional insureds in the commercial general liability insurance policy "for claims arising out of the performance of the named insured Party's Work." Moreover, the agreements provided that the aforementioned requirement must be included in all subcontracts relative to the work of the joint ventures. Ultimately, the Illinois State Toll Highway Authority awarded the two contracts to the joint ventures.

¶ 8    In February 2015, Walsh, as the designated general contractor for the projects, executed two identical subcontracts with VMR, one for the I-14-4208 project and the other for the I-14-4209 project, to furnish all labor, materials, equipment and supervision for the installation of rebar on the tollway construction projects. Under the subcontracts, VMR was required to procure and maintain commercial general liability insurance. Additionally, the subcontracts provided that "[t]he Contractor," designated as Walsh, "its parents, subsidiaries, and related entities," among others, were required to "be named as Additional Insured on each of" the policies VMR was obligated to procure and maintain "except for Worker's Compensation pursuant to an ISO form CG 2010 additional insured endorsement or any similar endorsement providing the same or broader coverage." The subcontracts also had an exhibit titled "Insurance Requirements" that required VMR to name various designated entities as well as "any parents, subsidiaries, and related entities" as additional insured on all policies of insurance except workers' compensation and a professional liability policy, with respect to liability arising out of VMR's operations. One of the designated entities was Walsh, as the general contractor. However, neither the Joint Venture nor K-Five were listed as designated entities. Additionally, the subcontracts stated that all work for the project "performed" by VMR "shall be processed and handled exclusively by" Walsh.

¶ 9                          B. The Westfield Policy

¶ 10     In April 2015, in light of the VMR's obligations under the subcontracts, it obtained a policy from Westfield that contained commercial general liability insurance with a one-year term. In the general liability declarations, VMR was listed as the named insured. Under the "Commercial General Liability Coverage Form" (coded as "CG 00 01 04 13"), there was a Section I titled "Coverages." Under this section, the policy provided, subject to various conditions, the general insuring agreement that Westfield had a duty to defend and indemnify an insured under the policy in any lawsuit seeking bodily injury or property damages. Section II of the Commercial General Liability Coverage Form was titled "Who Is An Insured" and had three parts. The first part was relevant to the named insured under the policy. The second part named additional people who were insured under the policy, such as volunteer workers or people working as the named insured's real estate manager. The third, and final, part provided that: "Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization" subject to three listed conditions. The final paragraph of the third part of Section II—and indeed the final paragraph of Section II—stated: "No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations."

¶ 11     The policy also contained a "Commercial General Liability Contractors Endorsement" (coded as "CG 7137 11 12") (the "Contractors Endorsement") that expressly modified the Commercial General Liability Coverage Form. In the introduction to the Contractors Endorsement, the endorsement stated that "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Still in the introduction, the Contractors Endorsement provided that "[c]overage afforded under this expanded coverage endorsement does not apply to any person or

organization covered as an additional insured on any other endorsement now or hereafter attached to this Coverage Form." The Contractors Endorsement, in part, broadened the definition of Section II—"Who Is An Insured"—of the Commercial General Liability Coverage Form and added other business entities as additional insureds under the policy. In addition, the Contractors Endorsement modified the third part of Section II of the Commercial General Liability Coverage Form. The first modification was merely changing one of the three conditions that affected any organization the named insured newly acquired or formed. The second modification stated that the "last paragraph of [part three of Section II] is deleted and replaced with the following: ***, no person or organization is an insured with respect to the conduct of any current or past joint venture, limited liability company or partnership that is not shown as a named insured in the Declarations" subject to a condition that is not relevant to this appeal.

¶ 12    Lastly, as relevant here, the policy contained an endorsement that modified the commercial general liability coverage and was titled: "Additional Insured - Owners, Lessees Or Contractors - Scheduled Person Or Organization" (coded as "CG 20 10 04 13") (the "Additional Insured Endorsement"). Like the Contractors Endorsement, in the introduction to the Additional Insured Endorsement, it stated that "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." The Additional Insured Endorsement further noted that it specifically was "modif[ying] insurance provided under the *** COMMERCIAL GENERAL LIABILITY COVERAGE PART." The Additional Insured Endorsement conferred status as an additional insured to "[a]ll persons or organizations when [the named insured has] agreed in writing in a contract or agreement that such persons or organizations be added as an additional insured."

¶ 13                      C. The Underlying Personal Injury Lawsuit

¶ 14 After VMR obtained its commercial general liability insurance policy, it began work on the Jane Addams Memorial Tollway construction project. In September 2015, Brown was working as an ironworker on the construction project for VMR. While Brown was manually carrying rebar from a designated shakeout area, he injured himself. In August 2017, Brown filed a three-count complaint sounding in negligence against Walsh, K-Five and the Joint Venture for the injuries he sustained while carrying the rebar.

¶ 15 Four months later, Brown filed an amended three-count complaint, again sounding in negligence and again naming Walsh, K-Five and the Joint Venture as defendants. For all three counts, Brown alleged that Walsh, K-Five and the Joint Venture were in control of the tollway project as general contractors or construction managers and that he was working on the project for VMR as an ironworker. Brown asserted that Walsh, K-Five and the Joint Venture had a duty to exercise reasonable care in the construction, supervision and operation of the project. Yet, despite this duty, Brown alleged that Walsh, K-Five and the Joint Venture, by and through their agents, servants and employees, failed in various manners to keep the construction project safe, including by: (1) failing to provide a safe, suitable and proper shakeout area for the storage of the rebar; (2) failing to provide safe, suitable and proper mechanical equipment or contrivances to be utilized with the rebar; (3) improperly allowing Brown and his co-workers to manually lift and carry the rebar for long distances; (4) refusing to allow Brown and his co-workers to have safe, suitable and proper mechanical equipment to carry the rebar; and (5) failing to provide a safe, suitable and proper pathway free from debris and other obstacles for the purposes of transporting rebar. According to Brown, due to Walsh, K-Five and the Joint Venture's negligent acts and omissions, he was forced to manually and dangerously lift pieces of rebar by hand and carry them lengthy distances from a designated shakeout area, which caused his injury. Count I was for retained

control over the construction work, Count II was for premises liability and Count III was for direct negligence. All three counts were directed against all three defendants. In response to Brown's amended complaint, the Joint Venture and Walsh each filed separate answers and separate affirmative defense. K-Five presumably did the same, but its answer and affirmative defenses were not included in the record on appeal.

¶ 16                                   D. The Declaratory Judgment Actions

¶ 17    In May 2018, after Walsh, K-Five and the Joint Venture tendered the defense of the Brown litigation to Westfield, it filed a two-count declaratory judgment action against the Joint Venture and Walsh seeking a declaration that it owed no duty to defend or indemnify them in connection with the Brown litigation. Although Westfield also named Brown as a defendant in the action, it did so only because he was a necessary party with an interest in the subject matter of the action and Westfield did not seek any relief from him. Count I of the complaint was directed against the Joint Venture while Count II was directed against Walsh. The Joint Venture and Walsh filed a joint answer and joint counterclaim for a declaratory judgment against Westfield asserting that they qualified as additional insureds under the policy Westfield issued to VMR. The Joint Venture and Walsh therefore sought a declaration that Westfield had a duty to defend and indemnify them in connection with the Brown litigation.

¶ 18    Westfield later amended its complaint for a declaratory judgment and added K-Five and Arch Insurance Company (Arch) as additional defendants. In the amended complaint, as Count III, Westfield sought a declaration that it had no duty to defend or indemnify K-Five. Additionally, Westfield noted that it added Arch as a defendant because it learned that Arch was funding some, or all, of Walsh's defense in the Brown litigation and therefore, Arch was a necessary party to the instant litigation.

¶ 19 In response, K-Five, Walsh and the Joint Venture each filed individual answers, wherein both K-Five and Walsh admitted that they had entered into two separate joint venture agreements. All three parties, however, filed a joint first amended counterclaim for a declaratory judgment, wherein they asserted that they qualified as additional insureds under the policy Westfield issued to VMR. They again sought a declaration that Westfield had a duty to defend and indemnify them in connection with the Brown litigation.

¶ 20                              E. Walsh's Motion for a Partial Judgment on the Pleadings

¶ 21 In September 2019, Walsh filed a motion for a partial judgment on the pleadings arguing that, in order to qualify as an additional insured under Westfield's policy, VMR must have agreed in writing to add Walsh as an additional insured. Walsh highlighted that, in the two subcontracts it executed with VMR, the company agreed to name Walsh as an additional insured. Walsh therefore posited that it qualified as an additional insured under the policy and no exclusions under the policy applied to negate that coverage. As such, Walsh contended that Westfield owed it a duty to defend in the Brown litigation. Two months later, Westfield responded to Walsh's motion, arguing that it owed no duty to defend Walsh because the joint venture exclusion in the policy eliminated Walsh's potential coverage.

¶ 22 In January 2020, the circuit court held a hearing on Walsh's motion. The court observed that, based on the language of the subcontracts between VMR and Walsh, VMR was required to name Walsh as an additional insured in its policy with Westfield. The court further noted that an endorsement in VMR's policy with Westfield provided that "any contractual agreement would trigger a coverage and a duty to defend." The court highlighted that a duty to defend is triggered whenever there is the "possibility" of liability based upon the allegations of the underlying complaint and such a possibility existed in this case. Additionally, the court found that no exclusion

in the policy negated the coverage. Consequently, the court granted Walsh's motion for a partial judgment on the pleadings.

¶ 23                    F. Cross-Motions for Summary Judgment

¶ 24    Beginning in March 2020, Westfield, the Joint Venture and K-Five filed various cross-motions for summary judgment. In Westfield's motions against the Joint Venture and K-Five, it argued that its policy with VMR did not cover the Joint Venture or K-Five as additional insureds because VMR's subcontracts did not require VMR to add the Joint Venture or K-Five as additional insureds where they were not referenced in the subcontracts and did not constitute a related entity of Walsh for purposes of the policy. Additionally, Westfield asserted that, even if there was potential coverage for the Joint Venture and K-Five, the policy's joint venture exclusion negated the possibility of coverage. In the Joint Venture and K-Five's motions for summary judgment, which technically were motions for partial summary judgment, they raised nearly identical arguments. They argued that they qualified as related entities of Walsh for purposes of the policy and thus, constituted additional insureds. The Joint Venture and K-Five also posited that the joint venture exclusion relied upon by Westfield was, at best, ambiguous, but, in any event, did not apply to them. As such, the Joint Venture and K-Five contended that Westfield owed them a duty to defend in the Brown litigation.

¶ 25    On December 4, 2020, after Westfield, the Joint Venture and K-Five completed briefing on their various cross-motions for summary judgment, the circuit court held a hearing on the parties' motions. Three days later, the court entered a written order. The court highlighted that a joint venture was governed by partnership principles, and thus, the coventurers of a joint venture were agents of each other and of the joint venture itself. Thus, the court concluded that the Joint Venture and K-Five were related entities of Walsh by law and constituted additional insureds under

VMR's policy with Westfield. Additionally, the court found that the joint venture exclusion in the policy was ambiguous as a matter of law based on this court's previous decision in *Clarendon American Insurance Co. v. B.G.K. Security Services, Inc.*, 387 Ill. App. 3d 697 (2008). Nevertheless, the court concluded that the joint venture exclusion did not apply to the Joint Venture or K-Five as additional insureds because their statuses as insureds came from a separate endorsement with no such exclusion. As such, the court concluded that Westfield had a duty to defend the Joint Venture and K-Five in connection with the Brown litigation. Consequently, the court granted the Joint Venture and K-Five's motions for partial summary judgment and denied Westfield's motions for summary judgment.

¶ 26    In April 2021, the parties entered into a funding agreement in the hopes of jointly negotiating a full and final settlement of all claims in the Brown litigation while also preserving Westfield's right to appeal the circuit court's rulings on the insurance coverage issues. The following month, the circuit court, though a different judge than in the instant case, dismissed the Brown litigation pursuant to a settlement.[1]

¶ 27    Back in the instant case, in June 2021, the circuit court found that, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), there was no just reason to delay either the enforcement or appeal, or both, of its various insurance coverage orders. Later that month, the court dismissed Brown from the instant litigation with prejudice. Westfield subsequently filed a timely appeal of the court's Rule 304(a) finding.

¶ 28                                    II. ANALYSIS

---

[1] As Westfield notes in its brief, the circuit court's dismissal order was not included in the record on appeal, but we may take judicial notice of this order. See *Seymour v. Collins*, 2015 IL 118432, ¶ 6 n.1.

¶ 29 Westfield contends that K-Five and the Joint Venture could not be considered additional insureds under VMR's policy with Westfield because there was no contract in writing that required VMR to add either K-Five or the Joint Venture to the policy as additional insureds. Additionally, Westfield contends that, even if K-Five or the Joint Venture could be considered additional insureds, the joint venture exclusion in the policy negated that coverage. Finally, Westfield argues that the joint venture exclusion also applied to Walsh and negated its potential coverage. As such, Westfield posits that it had no duty to defend Walsh, K-Five or the Joint Venture, and the circuit court's various rulings must be reversed.

¶ 30                    A. Relevant Legal Principles

¶ 31 Although the circuit court concluded that Westfield had a duty to defend Walsh, K-Five and the Joint Venture, it did so for Walsh based on Walsh's motion for a partial judgment on the pleadings and it did so for K-Five and the Joint Venture based on cross-motions for summary judgment. When reviewing a judgment on the pleadings, we are axiomatically limited to the pleadings. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). A judgment on the pleadings "is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hess v. Estate of Klamm*, 2020 IL 124649, ¶ 14. In analyzing such a motion, the circuit court is required to accept as true all well-pled facts set forth in the nonmoving party's pleadings and any rational inferences therein. *Wilson*, 237 Ill. 2d at 455. We review the circuit court's ruling on a judgment on the pleadings *de novo*. *Hess*, 2020 IL 124649, ¶ 14. Meanwhile, summary judgment is appropriate where the pleadings, depositions, affidavits, and admissions on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25. By filing cross-motions for summary judgment, Westfield, K-Five and the Joint Venture agree

that there is only a question of law involved and invite the court to resolve the litigation based solely upon the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. We review summary judgment rulings *de novo*. *Hess*, 2020 IL 124649, ¶ 14.

¶ 32     All of the rulings by the circuit court involved the interpretation of an insurance policy and determining the rights and obligation therein. Such issues are questions of law (*Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)) and appropriate issues to be resolved by a judgment on the pleadings and summary judgment. See *Hess*, 2020 IL 124649, ¶ 14. Given that we review rulings on a motion for a judgment on the pleadings and for summary judgment *de novo*, the standards for granting both are essentially the same (*Hess*, 2020 IL 124649, ¶ 14; *Carney*, 2016 IL 118984, ¶ 25) and all the critical documents were attached to Westfield's declaratory judgment complaint, we can analyze whether Westfield owed a duty to defend Walsh, K-Five and the Joint Venture under the same principles.

¶ 33     "When an insured sues its insurer over a denial of coverage, 'the existence of coverage is an essential element of the insured's case, and the insured has the burden of proving' " coverage. *ABW Development, LLC v. Continental Casualty Co.*, 2022 IL App (1st) 210930, ¶ 26 (quoting *St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Insurance Co.*, 146 Ill. App. 3d 107, 109 (1986)). In a declaratory judgment action, in order to determine whether an insurer had a duty to defend, we generally examine the allegations of the underlying complaint and compare them to the germane provisions of the insurance policy. *Wilson*, 237 Ill. 2d at 455. "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Id.* We liberally construe the allegations of the underlying complaint in favor of providing coverage to an insured. *General Agents Insurance Co. of America v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155 (2005). Moreover, "if several theories of

recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy." *Id.*

¶ 34    Under Illinois law, we interpret provisions of an insurance policy using the same rules that apply to other types of contracts. *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). When interpreting an insurance policy, the primary goal "is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Id.* "To ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purpose of the entire contract." *Crum*, 156 Ill. 2d at 391. When the language of an insurance policy is clear and unambiguous, we must give that language its plain and ordinary meaning. *Travelers Insurance Company v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292-93 (2001). However, if the language is ambiguous, *i.e.*, susceptible to multiple meanings, we will construe the language against the insurer, who drafted the policy. *Id.* at 293. Moreover, "provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer." *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997).

¶ 35                              B. Coverage under the Policy

¶ 36    Although Westfield devotes the majority of its brief—indeed it is Westfield's first contention raised—to arguing that the joint venture exclusion in the policy negated coverage to Walsh, K-Five and the Joint Venture in connection with the Brown lawsuit, Westfield makes various arguments about how K-Five and the Joint Venture could not constitute additional insureds. "An exclusion in an insurance policy is a provision that eliminates coverage that would have existed in the absence of the exclusion." *Wells v. State Farm Fire & Casualty Insurance Co.*,

2021 IL App (5th) 190460, ¶ 27. As such, we initially must determine if the policy covered K-Five and the Joint Venture absent an exclusion in the policy. For completeness sake, we will also address Walsh as an additional insured.

¶ 37                                    1. Walsh as an Additional Insured

¶ 38     We begin with Walsh, who executed the subcontracts with VMR as the contractor. Per the subcontracts, VMR was required to obtain a commercial general liability insurance policy and name Walsh, as the contractor, as an additional insured under the policy. An exhibit to the subcontracts reinforced this requirement. Fulfilling its obligation under the subcontracts, VMR obtained the policy through Westfield that included the Additional Insured Endorsement, which modified provisions under the commercial general liability coverage part. That endorsement conferred status as an additional insured to "[a]ll persons or organizations when [the named insured has] agreed in writing in a contract or agreement that such persons or organizations be added as an additional insured." Given that VMR had explicitly agreed in a written contract that Walsh be added as an additional insured under the commercial general liability insurance policy it would obtain, Walsh was an additional insured under that policy.

¶ 39     Furthermore, based on the allegations of Brown's amended complaint, the facts alleged therein potentially opened Walsh to liability individually. Although Brown sued the Joint Venture as well, his complaint alleged negligence directly against Walsh individually. "[I]f several theories of recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy." *Midwest*, 215 Ill. 2d at 155. That is to say, merely because Walsh was also sued in its capacity as a constituent entity of the Joint Venture, that did not preclude Westfield from having a duty to defend Walsh where Walsh was also sued in its individual capacity. As such, because Walsh was an additional

insured under the Westfield policy and the allegations of Brown's lawsuit opened Walsh up to potential liability in its individual capacity, the policy provided coverage to Walsh unless an exclusion applied.

¶ 40                                    2. K-Five and the Joint Venture as Additional Insureds

¶ 41    Turning to K-Five and the Joint Venture itself, although they were not explicitly named in the subcontracts Walsh executed with VMR as having to be designated as additional insureds, they posit that they constituted related entities of Walsh. Per the subcontracts, in addition to being obligated to obtain a commercial general liability insurance policy and name Walsh as an additional insured, VMR had to name Walsh's "parents, subsidiaries, and related entities" as additional insureds. The term "related entities" is not defined in the subcontracts, so in order to determine the intention of the parties in using that term, we must give that language its plan and ordinary meaning. *Eljer*, 197 Ill. 2d at 292-93. In doing so, we look to the dictionary. See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 366-67 (2006) (citing to Black's Law Dictionary and Merriam-Webster's Dictionary).

¶ 42    According to Black's Law Dictionary, "related" means "[c]onnected in some way" or "having relationship to or with something else," and "entity" is defined as "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners." Black's Law Dictionary (11th ed. 2019). Meanwhile, Merriam-Webster's Dictionary defines "related" as "connected by reason of an established or discoverable relation." Merriam-Webster's Online Dictionary, https://merriamwebster.com/dictionary/related (last visited July 5, 2022). And it defines "entity" as "an organization (such as a business or governmental unit) that has an identity separate from those of its members." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/entity (last visited July 5, 2022). The only

meaningful difference between these definitions is that an "entity" must have a separate *legal* identity from its members or owners, according to Black's Law Dictionary, whereas an "entity" merely must have a separate identity from its members, according to Merriam-Webster's Dictionary.

¶ 43    This distinction in the definition of "entity" between Black's Law Dictionary and Merriam-Webster's Dictionary highlights the importance of understanding the concept of a joint venture. In Illinois, a joint venture is governed by the same legal principles that govern a partnership. *Ioerger v. Halverson Construction Co., Inc.*, 232 Ill. 2d 196, 202 (2008). Whereas a partnership is a general business enterprise (*Bosch v. NorthShore University Health System*, 2019 IL App (1st) 190070, ¶ 85), "a joint venture is essentially a partnership carried on for a single enterprise." *In re Johnson,* 133 Ill. 2d 516, 526 (1989). Partners are agents of one another, and agents of the partnership itself as it relates to the business enterprise. *Ioerger*, 232 Ill. 2d at 202. And "[w]hile a partnership is treated as a separate entity for purposes of owning property, it is not a separate legal entity." *Id.* at 202-03. Similarly, a joint venture is not a separate legal entity. *Id.* at 203. And coventurers are agents of the other coventurers and of the joint venture itself. *Id.* at 202-03. Because of how intertwined coventurers and a joint venture are, our supreme court has stated that a joint venture is "inseparable from its constituent entities." *Id.* at 203.

¶ 44    Applying the definitions of "related" and "entity" as well as the legal principles of a joint venture, we conclude, as the circuit court did, that K-Five and the Joint Venture were related entities of Walsh. K-Five had a relationship with Walsh as coventurers in the joint venture construction project, and K-Five clearly had an identity separate from that of Walsh. Because Walsh was an agent of K-Five and vice versa due to their joint venture (*id.* at 202-03), K-Five was a related entity of Walsh. Similarly, the Joint Venture had a relationship with Walsh, as Walsh was

one of the Joint Venture's constituent entities. Thus, the Joint Venture was related to Walsh. As to whether the Joint Venture constituted an entity, looking at partnership law is again helpful since a joint venture and a partnership are governed by the same principles. *Id.* at 202.

¶ 45      As discussed, a partnership is not a separate legal entity, but it is treated as a separate entity for other purposes, such as owning property. *Id.* at 202-03. In fact, under Illinois tax law, partnership are considered "pass-through entities." See 35 ILCS 5/201(p) (West 2020) (providing that, under Illinois' income tax law, partnerships, other than publicly traded ones under the Internal Revenue Code, may elect to pay a "pass-through entity tax"). And, under the Illinois Uniform Partnership Act, "[a] partnership is an entity distinct from its partners." 805 ILCS 206/201(a) (West 2020). In other words, there is no doubt that a partnership constitutes an entity under Illinois law, regardless of the fact that it is not a separate legal entity. Because "a joint venture is essentially a partnership carried on for a single enterprise" (*In re Johnson,* 133 Ill. 2d at 526) and a joint venture is governed by the same legal principles that govern a partnership (*Ioerger*, 232 Ill. 2d at 202), the Joint Venture in this case was also an entity notwithstanding the fact that it was not a separate legal entity. As a result, the Joint Venture was a related entity of Walsh.

¶ 46      Still, Westfield highlights Walsh's subcontracts with VMR and posits that they did not explicitly reference K-Five or the Joint Venture as needing to be named as additional insureds on the policy. Relying on *Clarendon America Insurance Co. v. Aargus Security Systems, Inc.*, 374 Ill. App. 3d 591 (2007), *Cincinnati Insurance Co. v. Gateway Construction Co., Inc.*, 372 Ill. App. 3d 148 (2007), *Liberty Mutual Fire Insurance Co. v. St. Paul Fire and Marine Insurance Co.*, 363 Ill. App. 3d 335 (2005), Westfield posits that, because VMR did not agree in writing to add K-Five or the Joint Venture as additional insureds, they do not qualify as additional insureds as a matter of law. In *Cincinnati Insurance*, 372 Ill. App. 3d at 151, an insurance policy provided that: " 'All

corporations, partnership[s] and or/[*sic*] affiliated individuals promised to be added as additional insured[s] under a written contract with the Named Insured' " will be deemed additional insureds under the policy. Based on this policy language, this court concluded that an oral promise to be added as an additional insured did not satisfy the policy's requirement because it "would effectively nullify the import of the words 'under a written contract' in the endorsement" and render that provision "meaningless." *Id.* at 151-52.

¶ 47    In *Aargus*, 374 Ill. App. 3d at 592, two companies, Aargus Security Systems, Inc. (Aargus) and B.G.K. Security Services, Inc. (BGK), entered into an agreement to jointly provide security services for a commercial building. BGK obtained a commercial general liability insurance policy from Clarendon America Insurance Co. (Clarendon) that contained an endorsement conferring coverage as an additional insured on anyone that the named insured was " 'obligated by valid written contract to provide such coverage.' " *Id.* at 592-93. After the policy became effective, a fire broke out at the building causing injuries and death, which resulted in Aargus being sued in various lawsuits. *Id.* at 593. Aargus tendered the defense of the underlying lawsuits to Clarendon, who then filed a declaratory judgment action seeking a determination that it had no duty to defend Aargus as an additional insured under the policy it issued to BGK. *Id.* The circuit court found that Clarendon had no duty to defend Aargus and granted Clarendon's motion for summary judgment. *Id.* On appeal, the appellate court highlighted the endorsement's language that an additional insured was anyone BGK was obligated to provide coverage for by a written contract. *Id.* at 596. The court observed that the only written contract between Aargus and BGK was their joint security agreement, but noted that the agreement contained no obligation to provide insurance. *Id.* Consequently, the appellate court agreed that Clarendon had no duty to defend Aargus as an additional insured. *Id.* at 596, 599.

¶ 48    In *Liberty Mutual*, 363 Ill. App. 3d at 337, the Central Illinois Public Service Company (CIPS) and Dover Elevator Company (Dover) entered into two service contracts for Dover to upgrade elevators at a CIPS facility. In anticipation of the work, Dover obtained a commercial general liability insurance policy from Liberty Mutual Fire Insurance Company (Liberty). *Id.* After an elevator accident occurred and a personal injury lawsuit followed, Liberty filed a declaratory judgment action seeking a declaration that it did not have a duty to defend CIPS under its policy with Dover. *Id.* CIPS' own insurer, St. Paul Fire and Marine Insurance Co. (St. Paul), filed a counterclaim seeking a declaration that Liberty had a duty to defend CIPS. *Id.* at 338. Ultimately, the circuit court found that Liberty did not have a duty to defend CIPS and granted summary judgment in favor of Liberty. *Id.* On appeal, the appellate court highlighted an additional insured endorsement in Dover's policy with Liberty that made an additional insured " 'any person, organization, state or other political subdivision, trustee or estate for whom you have agreed in writing to provide liability insurance.' " *Id.* at 341. St. Paul contended that CIPS was made an additional insured under this endorsement due to the two service contracts it entered into with Dover. *Id.* However, this court found that the insurance provisions in both service contracts "only required Dover to secure insurance to cover its own negligence" and that "there was no language in the insurance provision or insurance specifications section that obligated Dover to add CIPS as an additional insured on the [commercial general liability insurance] policy." *Id.* at 342. Consequently, the appellate court agreed that Liberty had no duty to defend CIPS as an additional insured. *Id.* at 342-43.

¶ 49    What distinguishes the instant case from *Cincinnati Insurance, Aargus* and *Liberty Mutual* is the explicit language in the subcontracts entered into between VMR and Walsh that required VMR to obtain a commercial general liability insurance policy and name as additional insureds

Walsh's "parents, subsidiaries, and related entities." We cannot interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011). Rather, we must interpret the contract "as a whole, giving effect to every provision, if possible." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). "[W]hen parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect." *Thompson*, 241 Ill. 2d at 442. To this end, we must presume the term "related entities" was added to subcontracts purposely and so long as K-Five and the Joint Venture constituted related entities of Walsh, which we have determined they do, VMR agreed in writing to add them as additional insureds under its policy with Westfield.

¶ 50    Additionally, Westfield posits that the language of the subcontracts between Walsh and VMR must have been sufficiently specific and definite to create a legal obligation on the part of VMR to provide the additional insured coverage for K-Five and the Joint Venture. And to this end, according to Westfield, the subcontracts' term "related entities" was too vague to create any obligation on the part of VMR to benefit K-Five or the Joint Venture. Although Westfield arguably does not have standing to argue an ambiguity exists in the subcontracts between Walsh and VMR, as Westfield was not a party or third-party beneficiary to that contract (see *Landau, Omahana & Kopka, Ltd. v. Franciscan Sisters Health Care Corp.*, 323 Ill. App. 3d 487, 493 (2001)), the term "related entities" was not too vague to be enforceable using the dictionary definitions of the constituent words and principles of joint venture law.

¶ 51    Lastly, we briefly mention the prescient words this court pronounced in *LaGrange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 870 (2000), when discussing

the position insurers place themselves in when obligating themselves to defend unknown third parties with which named insureds have written agreements to add as additional insureds:

> "By drafting this language, [the insurer] acknowledged and accepted that its insured would be entering into contracts under which [the insurer] would be obligated to provide a defense ***. [The insurer] did not require that its insured get [the insurer's] approval of the contracts or require its insured to disclose the identities of the third parties or require that [named insured] name those parties as additional insureds. [The insurer] thus assumed the responsibility of providing defenses for certain unknown and unnamed third-party beneficiaries."

That's what occurred in this case, and based on the underlying allegations of Brown's lawsuit which potentially opened up the Joint Venture to liability and K-Five individually to liability, the policy provided coverage to K-Five and the Joint Venture as additional insureds unless an exclusion applied.

¶ 52                          C. The Joint Venture Exclusion

¶ 53    Having found that Walsh, K-Five and the Joint Venture were additional insureds under VMR's policy with Westfield due to the Additional Insured Endorsement, we now must determine whether the joint venture exclusion applied to eliminate that coverage. See *Wells*, 2021 IL App (5th) 190460, ¶ 27 ("An exclusion in an insurance policy is a provision that eliminates coverage that would have existed in the absence of the exclusion."). After an insured has established coverage, "the burden then shifts to the insurer to prove that a limitation or exclusion applies." *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453-54 (2009). In order to meet that burden, the policy's exclusion must clearly preclude coverage. *Vivify Construction, LLC v. Nautilus Insurance Co.*, 2017 IL App (1st) 170192, ¶ 16. "[A] policy provision that purports to exclude or limit

coverage will be read narrowly and will be applied only where its terms are clear, definite, and specific." *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 393 (2005).

¶ 54    Relying on the joint venture exclusion, Westfield claims the exclusion applied squarely to Walsh, K-Five and the Joint Venture. The exclusion was initially located in the Commercial General Liability Coverage Form and was the very last paragraph of Section II. However, the policy's Contractors Endorsement modified the paragraph containing the joint venture exclusion by deleting it and replacing it with the following: "[N]o person or organization is an insured with respect to the conduct of any current or past joint venture *** that is not shown as a named insured in the Declarations" subject to a condition that is not relevant to this appeal.

¶ 55    In arguing about the applicability of the joint venture exclusion, both parties rely heavily on *Clarendon American Insurance Co. v. B.G.K. Security Services, Inc.*, 387 Ill. App. 3d 697 (2008), which the circuit court itself used to find that the joint venture exclusion in Westfield's policy was ambiguous as a matter of law and thus, inapplicable to negate coverage to Walsh, K-Five and the Joint Venture. In *B.G.K.*, there was a joint venture exclusion in an insurance policy that was nearly identical to the joint venture exclusion in this case. In *B.G.K.*, the provision provided that: " 'No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.' " *Id.* at 706.

¶ 56    The facts of *B.G.K.* will sound familiar as it was related to the *Aargus* decision. In the case, two companies, Aargus Security Systems, Inc. (Aargus) and B.G.K. Security Services, Inc. (BGK), entered into an agreement, in part, titled " 'Joint Venture Agreement' " to jointly provide security services for a commercial building. *Id.* at 699. BGK obtained a commercial general liability insurance policy from Clarendon America Insurance Co. (Clarendon), in which it was the named

insured. *Id.* After the policy became effective, a fire broke out at the building causing injuries and death, which resulted in BGK being sued in its individual capacity in various lawsuits for negligence. *Id.* at 700. In those lawsuits, no plaintiff ever referenced a joint venture. *Id.* at 704, 706. In answering the various complaints, BGK admitted that it had entered into an agreement with Aargus relating to security. *Id.* at 701. BGK tendered the defense of the underlying lawsuits to Clarendon, who then filed a declaratory judgment action seeking a determination that it had no duty to defend BGK because BGK had entered into a joint venture with Aargus, and Clarendon's policy excluded coverage for joint ventures. *Id.* at 701-02. BGK denied that it had entered into a joint venture with Aargus throughout the litigation. *Id.* at 702. On cross-motions for summary judgment, the circuit court found that Clarendon had a duty to defend BGK, and therefore granted summary judgment for BGK. *Id.*

¶ 57 On appeal, Clarendon primarily contended that the circuit court should have considered the agreement between Aargus and BGK to jointly provide security services in addition to the underlying complaints and the policy issued by Clarendon to determine whether a joint venture existed between Aargus and BGK given the policy's joint venture exclusion. *Id.* This court found that, because BGK was sued in its individual capacity for negligence and it was the named insured under the policy with Clarendon, the potential for coverage existed notwithstanding the agreement between Aargus and BGK. *Id.* at 703-705. Nevertheless, this court stated that, even if it were to consider the agreement between Aargus and BGK, the joint venture exclusion provision relied upon by Clarendon was "ambiguous." *Id.* at 705. The court reasoned that the entity's conduct at issue in the underlying complaint was BGK's because it was the named defendant and the complaint never once mentioned the conduct of any joint venture. *Id.* at 706. Additionally, this court found that "Clarendon's interpretation adds additional limiting language to this provision

because nothing in the provision requires the organization indicated as the 'Named Insured' to be named as the joint venture." *Id.*

¶ 58     While B.G.K. was undoubtedly correct based on the circumstances of its case, we do not read *B.G.K.* as broadly as the circuit court did or as broadly as Walsh, K-Five and the Joint Ventures do. First, there are critical distinctions between *B.G.K.* and the instant case. First, in *B.G.K.*, BGK—the entity seeking coverage—was the named insured under the pertinent policy whereas in this case, the named insured under the pertinent policy was VMR, not Walsh, K-Five or the Joint Venture, who are the ones seeking coverage. Second, in *B.G.K.*, BGK was sued individually in the underlying lawsuits, and no plaintiff ever mentioned a joint venture, whereas in this case, while Walsh and K-Five were sued in their individual capacity for negligence, the Joint Venture, of which they were constituent entities, was also sued. Third, in *B.G.K.*, BGK denied the existence of a joint venture throughout the litigation, whereas both Walsh and K-Five admitted in their answers that they entered into two joint venture agreements. Beyond those critical distinctions, finding that the joint venture exclusion in *B.G.K.* was ambiguous *as a matter of law* would contravene the well-settled principles of interpreting insurance policies. "To ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purpose of the entire contract." *Crum*, 156 Ill. 2d at 391. Insurance policies are unique documents, and even though similar, or even identical, language may be used in one provision of a policy, that does not mean the other provisions of the policy are similar or identical. As such, we believe that the court in *B.G.K.* found the joint venture exclusion in its case ambiguous based on its own unique facts, not ambiguous as a matter of law and inapplicable in all factual scenarios. Therefore, the decision

does not mandate a finding in this case that the joint venture exclusion in VMR's policy with Westfield was ambiguous.

¶ 59    However, regardless of whether the joint venture exclusion was ambiguous, based on the relevant portions of the policy, the joint venture exclusion did not apply to Walsh, K-Five or the Joint Venture. The joint venture exclusion was initially located in part three of Section II of the Commercial General Liability Coverage Form. However, the policy's Contractors Endorsement modified the joint venture exclusion by "delet[ing]" the joint venture exclusion in the Commercial General Liability Coverage Form and replacing it with the language provided in the Contractors Endorsement. Importantly, in the introduction to the Contractors Endorsement, it stated that "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULY." By using the word "changes" in the introduction, the endorsement plainly advised that the scope of coverage was different than under the original policy. See *Mank v. West American Insurance Co.*, 249 Ill. App. 3d 827, 831 (1993) (observing that, where an "exclusion endorsement warned the insured that 'THIS ENDORSEMENT CHANGES THE POLICY' and advised the policyholder to read the endorsement carefully," it demonstrated an intent by the insurer to have the endorsement control the policy) (Emphasis in original). The endorsement further noted that the "[c]overage afforded under this expanded coverage endorsement does not apply to any person or organization covered as an additional insured on any other endorsement now or hereafter attached to this Coverage Form." That notation is wherein lies the problem for Westfield.

¶ 60    Earlier, we concluded that Walsh, K-Five and the Joint Venture were considered additional insureds under VMR's policy with Westfield for two reasons. First, due to the language of VMR's subcontracts with Walsh, where VMR agreed to obtain a commercial general liability insurance policy and name Walsh and Walsh's "related entities" as additional insureds. And second, due to

the Additional Insured Endorsement in Westfield's policy, which conferred status as an additional insured to "[a]ll persons or organizations when [the named insured has] agreed in writing in a contract or agreement that such persons or organizations be added as an additional insured." Clearly, the Additional Insured Endorsement is, in the words of the Contractors Endorsement, "any other endorsement now or hereafter attached to this Coverage Form." This language from the Contractors Endorsement demonstrates an intent by Westfield to make any entity covered as additional insured on any other endorsement attached to the policy fall outside the purview of the Contractors Endorsement. And considering that the Contractors Endorsement deleted and replaced the joint venture exclusion from the Commercial General Liability Coverage Form, this demonstrates an intent by Westfield to make the joint venture exclusion in the Contractors Endorsement supersede the joint venture exclusion previously existing in the Commercial General Liability Coverage Form, and thus, inapplicable to an entity covered as additional insured on the Additional Insured Endorsement. See *Pekin Insurance Co. v. Recurrent Training Center, Inc.*, 409 Ill. App. 3d 114, 118 (2011) (stating that when "provisions of a policy and an attached endorsement conflict, the terms and conditions of the endorsement control and supersede the conflicting policy provisions").

¶ 61     Because the plain language of the Contractors Endorsement mandates that the endorsement does not apply to "any person or organization covered as an additional insured on any other endorsement now or hereafter attached," the joint venture exclusion therein did not negate coverage for Walsh, K-Five or the Joint Venture, as additional insureds under the Additional Insured Endorsement. Moreover, the Additional Insured Endorsement did not contain any joint venture exclusion to somehow resurrect the exclusion. Because Walsh, K-Five and the Joint Venture were additional insureds under VMR's policy with Westfield due to the Additional

Insured Endorsement and the joint venture exclusion found in the Contractors Endorsement that replaced the joint venture exclusion originally found in the Commercial General Liability Coverage Form did not apply to them to negate coverage, Westfield owed a duty to defend all three entities. Consequently, the circuit court correctly granted Walsh's motion for a partial judgment on the pleadings and the Joint Venture and K-Five's motions for partial summary judgment, and it correctly denied Westfield's motions for summary judgment.

¶ 62                                    III. CONCLUSION

¶ 63    For the foregoing reasons, we affirm the judgments of the circuit court of Cook County.

¶ 64    Affirmed.